1

2                **UNITED STATES DISTRICT COURT**

3                    **DISTRICT OF OREGON**

4                   **PORTLAND DIVISION**

5

6  MART VAN DINE,                    )
                                     )
7              Plaintiff,            )    No. 03:10-cv-00712-HU
                                     )
8  vs.                               )
                                     )
9  MICHAEL J. ASTRUE,                )  **FINDINGS AND RECOMMENDATION**
   Commissioner of Social Security,  )
10                                   )
              Defendant.             )
11
                   _____
12

13

14 Merrill Schneider
   P.O. Box 14490
15 Portland, OR 97293

16      Attorney for Plaintiff

17

18 S. Amanda Marshall
   United States Attorney
19 Adrian L. Brown
   Assistant United States Attorney
20 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
21

22 Franco L. Becia
   Special Assistant United States Attorney
23 Social Security Administration
   Office of the General Counsel
24 701 Fifth Avenue, Suite 2900 M/S 221A
   Seattle, WA 98104-7075
25
        Attorneys for Defendant
26

27

28

   1 - FINDINGS & RECOMMENDATION

**TABLE OF CONTENTS**

I.    PROCEDURAL BACKGROUND. . . . . . . . . . . . . . . . . 3

II.   FACTUAL BACKGROUND.. . . . . . . . . . . . . . . . . . 5

      A.    Introduction. . . . . . . . . . . . . . . . . . 5

      B.    summary of the Medical Evidence.. . . . . . . . 6

      C.    Vocational Expert's Testimony.. . . . . . . . . 58

      D.    Van Dine's Testimony. . . . . . . . . . . . . . 59

            1.    Hearing testimony. . . . . . . . . . . . 59

            2.    Written testimony. . . . . . . . . . . . 67

      E.    Third-Party Testimony.. . . . . . . . . . . . . 70

III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF.. . . 73

      A.    Legal Standards.. . . . . . . . . . . . . . . . 73

      B.    The ALJ's Decision. . . . . . . . . . . . . . . 76

IV.   STANDARD OF REVIEW.. . . . . . . . . . . . . . . . . . 82

V.    DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . 83

      A.    Introduction. . . . . . . . . . . . . . . . . . 83

      B.    Step Two Analysis.. . . . . . . . . . . . . . . 83

      C.    Credibility Assessment. . . . . . . . . . . . . 84

            1.    Van Dine's problems with his hands.. . . 85

            2.    Mental health treatment. . . . . . . . . 86

            3.    August 17, 2005, MRI studies.. . . . . . 88

            4.    Dizziness. . . . . . . . . . . . . . . . 90

            5.    Daily activities.. . . . . . . . . . . . 91

            6.    ALJ's conclusions regarding drug-seeking
                  behavior.. . . . . . . . . . . . . . . . 94

      D.    Opinions of Treating Physicians.. . . . . . . . 99

VI.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . 104

VII.  SCHEDULING ORDER.. . . . . . . . . . . . . . . . . . . 105

2 - FINDINGS & RECOMMENDATION

1  HUBEL, United States Magistrate Judge:

2      The plaintiff Mart Van Dine seeks judicial review pursuant to

3  42 U.S.C. § 405(g) of the Commissioner's final decision denying his

4  applications for Disability Insurance ("DI") benefits under Title

5  II of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and

6  Supplemental Security Income ("SSI") under Title XVI of the Act.

7  Van Dine argues the Administrative Law Judge ("ALJ") erred in

8  numerous respects, including finding that his impairments are not

9  severe; finding his testimony was not fully credible; and rejecting

10  the opinions of two of his primary care physicians. *See* Dkt. ##20

11  & 22.

12

13                    *I.  PROCEDURAL BACKGROUND*

14      Van Dine protectively filed an application for DI benefits on

15  November 22, 2002, alleging a disability onset date of November 25,

16  2000. (A.R. 108-10[1]; 170-83[2]) The application was denied initially

17  on February 3, 2003 (A.R. 57), and it does not appear from the

18  record that Van Dine sought reconsideration.[3]

19  _____

20      [1]Some of the record citations in Van Dine's brief, to which
    the Commissioner stipulated (Dkt. #21, p. 2), are in error,
21  confusing the applications currently under review with this earlier
    application.

22      [2]The administrative record was filed electronically using the
23  court's CM/ECF system.  Dkt. #15 and attachments.  Pages of the
    record contain three separate page numbers: two located at the top
24  of the page, consisting of the CM/ECF number (e.g., Dkt. #15-1,
    Page 202 of 204), and a Page ID#; and one located at the lower
25  right corner of the page, representing the numbering inserted by
    the Agency.  Citations herein to "A.R." refer to the agency
26  numbering in the lower right corner of each page.

27      [3]It appears Van Dine had an even earlier application for
    benefits that was denied at the rehearing stage in December 2001.
28                                              (continued...)

3 - FINDINGS & RECOMMENDATION

Van Dine protectively filed new applications for DI and SSI benefits on October 20, 2004, at age forty-eight, claiming a disability onset date of August 18, 2004. (A.R. 19, 102-04) Van Dine is 5'9" tall, and at the time of these applications, he weighed 200 pounds. (A.R. 197) He claims he is disabled due to "Upper back lower neck c4 c5 c6 fusion, arthritis, degenerative disc disease, anxiety and panic disorder, eyes operated on twice for strobismis [sic][4], tumor taken out of right arm twice and has returned again, lost control of bowels, legs and arms, temporary parilization [sic] of limbs. More disc pertrusion [sic]." (A.R. 197-98)

Van Dine's applications were denied initially and on recon-sideration. (A.R. 55-56, 79-84, 601-06) He requested a hearing (A.R. 77), and a hearing was held on October 26, 2007, before an ALJ. (A.R. 619-63) Van Dine was represented by an attorney at the hearing. (See A.R. 619[5]) Van Dine testified at the hearing, and a Vocational Expert ("VE") also testified. Id. On December 6, 2007, the ALJ issued his decision, finding Van Dine "is capable of performing his past relevant work as a drug and alcohol abuse

---

[3](...continued)
See A.R. 170, item no. 7. Neither the 2001 application nor the 2002 application is at issue in this case.

[4]"Strabismus is a disorder in which the two eyes do not line up in the same direction, and therefore do not look at the same object at the same time. The condition is more commonly known as 'crossed eyes.'" U.S. National Library of Medicine, National Institutes of Health, "Medline Plus" (searched Jan. 4, 2012), http://www.nlm.nih.gov/medlineplus/ency/article/001004.htm.

[5]In Van Dine's brief, he states he was represented at the hearing "by his attorney, Merrill Schneider[.]" Dkt. #20, p. 1. However, the hearing transcript indicates Van Dine was represented at the hearing by attorney Brian Wayson. (A.R. 619, 621)

1  intake counselor," and he therefore is not disabled.  (A.R. 128-29)
2  Van Dine appealed the ALJ's decision, and on April 22, 2010, the
3  Appeals Council denied his request for review (A.R. 5-8), making
4  the ALJ's decision the final decision of the Commissioner.  *See* 20
5  C.F.R. §§ 404.981, 416.1481.

6      Van Dine filed a timely Complaint in this court, seeking
7  judicial review of the Commissioner's final decision.  The matter
8  now is fully briefed, and I submit the following Findings and
9  Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

10
11              *II.  FACTUAL BACKGROUND*
12                  *A.  Introduction*

13      A preliminary note is in order to explain the court's
14  methodology in summarizing Van Dine's medical records.  Van Dine
15  alleges a disability onset date of August 18, 2004.  As a result,
16  with one notable exception, I have only discussed his medical
17  records prior to that point as necessary to provide background for
18  his current complaints.  The exception relates to Van Dine's
19  ongoing use of narcotic pain medications, which is worthy of
20  careful consideration in this case given the ALJ's findings and
21  Van Dine's objections thereto.  The ALJ found Van Dine "absolutely
22  has no credibility," noting that "since September 2001, he has
23  clearly engaged in narcotic drug seeking behavior because of his
24  alleged pain complaints[.]"  (A.R. 21, 27)  The ALJ therefore
25  rejected Van Dine's subjective complaints of pain and limitations.
26  Van Dine argues the ALJ erred in this regard, asserting his
27  physical condition has continued to worsen over time without any
28  significant abatement.  He argues the ALJ ignored relevant

5 - FINDINGS & RECOMMENDATION

1  evidence, and exaggerated or misstated other evidence of record.
2  *See* Dkt. #20.  Because of the parties' focus on Van Dine's use of
3  narcotics, I have summarized the evidence relevant to this issue in
4  some detail, including evidence that predates his alleged onset
5  date.

7  **B.  Summary of the Medical Evidence**

8       On December 15, 2000, Van Dine was seen by Perry E. Camp,
9  M.D., a neurosurgeon, for a preoperative examination.  Van Dine
10 gave a history of a work-related injury that occurred on July 17,
11 1998, while he was lifting and pulling heavy stock on a mill chain.
12 Van Dine initially had been treated by a chiropractor, and he was
13 seen by a doctor, but apparently the workers' compensation insurer
14 initially denied the doctor's request for an x-ray evaluation of
15 Van Dine's cervical and thoracic areas.  He was referred to another
16 doctor who ultimately ordered thoracic and cervical MRIs which were
17 reviewed by Dr. Camp.  Dr. Camp noted images showed Van Dine's
18 cervical spine was "remarkably abnormal," including "substantial
19 spinal cord effacement and unequivocal hyperintensity within the
20 spinal cord providing direct evidence of myelopathic involvement"
21 at the C5-6 level.  (A.R. 262)  Van Dine was experiencing symptoms
22 including bladder and bowel incontinence, gait change and lower
23 extremity problems, and upper extremity paresthesia and weakness.
24 *Id.*  The doctor recommended "spinal cord decompression" to relieve
25 "severe cord compression."  (A.R. 265)  He noted Van Dine "was at
26 a significant risk for further injury with addition[al] flexion/
27 extension movement of the neck and cautioned that given the
28 interval of time since the onset of these symptoms they may not be

6 - FINDINGS & RECOMMENDATION

1  reversible but certainly could be progressive in the face of either
2  substantial delay of treatment or of significant additional
3  injury." *Id.*

4       Van Dine began treatment at the La Grande Clinic beginning in
5  February 2001. (*See* A.R. 329-53)  When he began treatment at the
6  clinic, he gave a history of a work-related injury while "pulling
7  heavy material in July of 1998[.]"  (A.R. 351)  He developed upper
8  and lower extremity weakness, bowel and bladder incontinence, upper
9  extremity paresthesias, general weakness, and gait change, and was
10 using a wheelchair.  He underwent "an anterior cervical discectomy
11 with anterior cord decompression and fusion C4-5 and C5-6," which
12 resulted in some improvement overall, although he continued to have
13 decreased coordination, and weakness in his fingers and his lower
14 extremities.  (*Id.*)  He was treated on an ongoing basis for high
15 blood pressure; anxiety and panic attacks; and pain and muscle
16 spasms that varied in intensity and location through the ensuing
17 years.  At various times, he took Vicodin, OxyContin, Trazodone,
18 Percocet, Doxepin, Valium, Flexeril, and Vioxx.  (*See* A.R. 330-53)

19      On February 22, 2001, Van Dine saw Dr. Camp for followup.  He
20 was healing well after his surgery, with "near normal strength in
21 his right upper extremity," but weakness in his left side.  (A.R.
22 354)  The doctor noted Van Dine "could have significant sensory
23 abnormalities which wax and wane and absolutely certainly he
24 continues to have unequivocal spasticity in the lower extremities
25 and to a lesser extent, the upper extremities, related to this cord
26 lesion."  (*Id.*)  Dr. Camp also noted:

27              Another problem for Mr. Vandine [sic] which is
                one I think is important to address is the
28              fact that due to the prolonged nature of the

7 - FINDINGS & RECOMMENDATION

1
2
3
4
5

> diagnostic process which was undertaken here
> and some contentious interactions with the
> carrier, Mr. Vandine [sic] is having some
> significant difficulties with anger manage-
> ment, emotional management, and subsequently
> probably some medical complications relating
> to the management of [his] hypertension, etc.,
> relating to the ongoing claims process.

6  (*Id.*)   He noted Van Dine was in counseling "relative to anger

7  management and the grief reaction associated with the loss of a

8  neurologic function which he has suffered[.]"   (A.R. 355)

9      In January 2002, Van Dine reported that his spinal injury was

10  "stationary," and he planned to train as a Human Resources manager.

11  (A.R. 342)   Doctor's notes indicate he was "medically stable based

12  on his appraisal."   (*Id.*)   Subsequent notes indicate Van Dine

13  continued to have pain in his neck, arms, and legs, and he

14  continued to take pain medications.

15      In January 2002, the La Grande Clinic's notes indicate,

16  "Written note for patient stating he needs chair to have padded

17  seat and back - handicapped parking sticker issued."   (A.R. 343)

18      La Grande Clinic notes from May 2002, indicate Van Dine's

19  "[c]hronic pain/anxiety/panic attacks and possible depression" were

20  "[m]uch improved."   He was being treated with Doxepin, but doctors

21  were considering a switch to Paxil or Clonazepam.   (A.R. 356)   He

22  continued to show improvement on Doxepin on June 10, 2002.   (*Id.*)

23  A report from a "neuromuscular consultation" on June 26, 2002,

24  refers several times to Van Dine's history of depression/anxiety.

25  (A.R. 373-82)   Notes from family practitioner Lehlia P. Smith, M.D.

26  indicate she treated Van Dine from October 2002 through October

27  2003, for anxiety and panic attacks.   At various times, they tried

28

8 - FINDINGS & RECOMMENDATION

1 Elavil, Buspar, Paxil, Wellbutrin, Valium, and Imipramine, with
2 mixed results.  (A.R. 277-86, 424)

3     In October 2002, Van Dine asked doctors at the La Grande
4 clinic for a note stating he was unable to work.  He was advised
5 that doctors at the clinic were unable to comply with his request,
6 and Van Dine stated he would "go somewhere else and get somebody
7 else to do it." (A.R. 350)  Someone from the clinic called to
8 speak with Vine Dine on October 9, 2002, and the caller was advised
9 that Van Dine was "doing great" and was "outside working on his
10 car." (*Id.*)

11     On May 27, 2003, Van Dine told Dr. Smith he was "feeling quite
12 hopeful about job opportunities." (A.R. 426)  He wanted to
13 decrease his oxycodone dosage, which they reduced to 5 mg. daily.
14 Van Dine was given a "supply of 25" pills. (*Id.*)

15     On July 8, 2003, Van Dine was given "10 extra oxycodone
16 10 mg." (*Id.*)  On August 1, 2003, Van Dine saw Dr. Smith "needing
17 approximately 25 oxycodone per month now." (*Id.*)  Van Dine was
18 "doing a lot of weight lifting" and had "become much more
19 muscular." (*Id.*)  He was given a prescription for 10 oxycodone
20 pills, 5 mg. strength, "and encouraged to keep working at
21 decreasing narcotic dose although this patient has made a lot of
22 progress so far." (*Id.*)

23     On September 16, 2003, Van Dine saw Dr. Smith with a complaint
24 that he had injured himself three days earlier "when digging a
25 hole." (A.R. 425)  He had gone to the emergency room with
26 complaints of pain in his lumbar region, radiating to the rectum
27 and penis.  He stated he "used up most of his Vicodin within the
28 first 48 hours of that injury." (*Id.*)  He was noted to be

9 - FINDINGS & RECOMMENDATION

1  "anxious," and "[t]ender to palpation in the mid lumbar region."

2  (*Id.*)  Van Dine stated his pain level was "much improved at the

3  present time," and he asked to return "to more regular level of

4  oxycodone, which is 25 per month right now."  (*Id.*)   He was

5  referred for a lumbar MRI.  (*Id.*)

6      Van Dine saw Dr. Smith on October 10, 2003.  She noted:

> The patient has been taking oxycodone once a
> day, cutting down from three per day when he
> had acute back injury, doing two per day, and
> now one per day.  He stopped yesterday.  He is
> concerned that oxycodone may be worsening his
> anxiety and making him angrier.  He feels a
> little bit of withdrawal symptoms today.
> Already has things like Benadryl and Lomotil
> ready for withdrawal symptoms.  States that at
> work he has been told that his anxiety seems
> to be affecting his work.  He is concerned
> that he wants to be in better shape for the
> job.
>
> Takes Naproxen 550 mg every few days, which
> does help the back problem.  He wants to get
> some Diazepam today as he goes into withdrawal
> from Oxycodone.

17  (*Id.*)  The doctor's assessment included "Narcotic addiction" and

18  "Anxiety disorder."  (*Id.*)  Van Dine was directed to "continue

19  without oxycodone."  (*Id.*)  He was prescribed Valium 10 mg. twice

20  daily, and given a supply of 20 pills, with followup in one week.

21  Notes indicate Buspar might be tried for his anxiety if it

22  continued to affect his work. (*Id.*)

23      On October 17, 2003, Van Dine called to request 10 oxycodone

24  pills. (*Id.*)  He was seen on October 21, 2003, for "follow up of

25  narcotic dependence." (A.R. 424)  The doctor noted:

> This was originally for back pain.  He was on
> oxycodone once a day.  He has not stopped this
> as of yesterday since he will have job
> retraining done, doing it mostly at home.  He
> has been taking Valium 10 mg [twice daily].

10 - FINDINGS & RECOMMENDATION

He wants to go up to [three times daily] for
the next week; and then when he is withdrawn
from the oxycodone, he will drop down to
Valium every three days and oxycodone #15 per
month he thinks would maintain him without
leading to escalating dosages. . . . The
patient is already having diarrhea. He has
Imodium for that. Usually he will get into
yawning and nauseated feelings, etc. with his
narcotic withdrawal. [Plan] He is very
motivated to come off the oxycodone and then
just go to a maintenance of #15 per month, as
stated, with Valium every three days for his
chronic anxiety. We have already tried vari-
ous antidepressants and Wellbutrin for his
anxiety, which had various side effects. We
will take a look at that again after he goes
through his narcotic withdrawal. A prescrip-
tion for Valium 10 mg [three times daily] for
one week was given.

(*Id.*)

Van Dine saw Dr. Smith on November 11, 2003, "complaining of
left shoulder pain which is somewhat chronic but had an acute
episode after lifting weight the previous week." (*Id.*) Van Dine
was "now taking oxycodone once a day although occasionally takes
none. Taking Valium one every three days. Taking Naproxen for the
shoulder pain . . . about once a day." (*Id.*) The doctor suggested
"decreasing from oxycodone to Vicodin," and she prescribed Vicodin
three times daily for two weeks, then twice daily for two weeks,
and then once daily for two weeks. She noted, "Hopefully this will
get him down to a much lower level of narcotics since that is his
goal." (A.R. 423)

On February 17, 2004, Van Dine saw Dr. Smith for followup of
his neck and back problems. The doctor noted the following:

The patient states that when he went to the
E.R. he had severe neck pain; however, he had
been taking oxycodone with Tylenol which he
cannot tolerate. He was taking four per day
and then two per day and is now down to about

11 - FINDINGS & RECOMMENDATION

one per day.  He says he is getting headaches.
He had previously gotten headaches before the
cervical disk problem was diagnosed and anti-
migraine medication had not worked.  He feels
that it starts at the lower C-spine and goes
up and creates a tension headache.  The
patient is . . . now taking oxycodone 5 mg.
once a day.  The Valium is occasional.  He
takes an occasional Soma and he is taking some
Naproxen.

He states his left shoulder pain is somewhat
chronic but is mild.  He says he does not have
time for physio right now and does not know if
it is covered by insurance.  He is also not
exercising any more.  He has not been doing
weights.  He has not been doing any aerobic
activity. . . .  [W]e had a long discussion
regarding exercise, weights, the amount of
oxycodone used, etc.

(*Id.*)  The doctor prescribed "oxycodone 5 mg once a day, supply of #30, to last for a full month."  (*Id.*)

Van Dine saw Dr. Smith on March 9, 2004, complaining of pain in the occipital area of his head and in his neck following a bump on the head the previous week.  He was "taking oxycodone 5 mg [twice daily]," and asked about a longer-acting drug rather than the oxycodone.  (A.R. 422)  He was "switched to oxycontin CR[6] 10 mg supply of #30 and Soma one [by mouth at bedtime] supply of #30, no refills."  (*Id.*)

Dr. Stanton (formerly known as Dr. Smith[7]) saw Van Dine on March 30, 2004, for followup of "ongoing neck pain."  (*Id.*) Van Dine complained that OxyContin took "too long to work" and was

[6]OxyContin is one proprietary formulation of oxycodone hydrochloride.  The "CR" refers to "controlled release."  *See* http://www.rxlist.com/oxycontin-drug.htm (visited 02/27/12).

[7]The Record does not reflect whether the name change was due to a marriage or a divorce.

12 - FINDINGS & RECOMMENDATION

1  not covered by his insurance, and he requested a change back to
2  oxycodone.  He stated he was "using now #20 of Valium as opposed to
3  #10."  (*Id.*)  He reported "no new change in the neck pain," grading
4  the pain as 7 to 8 on a 10-point scale.   The doctor prescribed
5  oxycodone 5 mg. twice daily, giving him 40 for the month.  She also
6  continued his Valium, with refills.  (*Id.*)

7       Van Dine called Dr. Stanton's office on April 6, 2004.  Notes
8  indicate, "Taper off on Vicodin #42," four daily down to two daily.
9  (*Id.*)  On April 10, 2004, he was given another 25 Vicodin, to take
10 twice daily.  (*Id.*)

11      Dr. Stanton saw Van Dine on April 23, 2004, for followup of
12 hypertension and "Chronic narcotic dependence, trying to taper down
13 from oxycodone to Vicodin."  (A.R. 421)  He was taking two-and-a-
14 half Vicodin a day at that point.  Van Dine requested 30 Vicodin
15 taken twice daily, "hoping to taper down to two and then one per
16 day and then hopefully stop.  He says his wife thinks that he is
17 not getting enough pain control; however, he is very concerned
18 about the fact that his narcotic use quickly escalates, and he
19 wants to keep tabs on that."  (*Id.*)  He was given 30 Vicodin to
20 take twice daily, with one refill.  He was "encouraged to try and
21 keep narcotic use as low as possible."  (*Id.*)

22      On May 4, 2004, Van Dine saw Dr. Stanton with a complaint that
23 he had "reinjured his back while doing gardening work."  (A.R. 421)
24 He also complained of "chronic headaches, about five days per week,
25 since 1990 after his cervical neck problem."  (*Id.*)  Van Dine
26 stated he could not take Vicodin more than twice daily due to
27 stomach upset, and he asked to go back on oxycodone during the
28 acute injury.  He reported "numbness down the left leg and no more

13 - FINDINGS & RECOMMENDATION

1   urinary incontinence than usual." (*Id.*)  Notes indicate Van Dine
2   moved "very stiffly," stating he had "pain down the midline of the
3   whole lumbar area, forward bending only to about 30 degrees," and
4   "unwilling to hyperextend or side bend due to pain." (*Id.*)
5   Dr. Stanton diagnosed "[a]cute worsening of lumbar pain due to
6   probably over exercising"; "[c]hronic headaches due to cervical
7   spine problems"; and "[n]arcotic dependence." (*Id.*)  She ordered
8   cervical and lumbar MRIs, and prescribed oxycodone 5 mg. three
9   times daily for two weeks.  (A.R. 420-21)  Van Dine expressed
10  frustration at his ongoing, chronic pain, although he did not want
11  more surgery.  He was unsure whether insurance would cover physio-
12  therapy, but if it did not, he could not afford the treatment.
13  (A.R. 420)

14       Van Dine returned to see Dr. Stanton on May 14, 2004.  He was
15  depressed about his pain, and complained of rapidly developing
16  numbness of his left arm and both legs.  The MRI of his lumbar
17  spine was unchanged from the previous study, but his cervical spine
18  showed "more posterior disk bulging of C2, C3, C4," which was not
19  mentioned in the prior study.  There was no change in his urinary
20  incontinence.  Dr. Stanton gave him 90 oxycodone 5 mg, to take
21  three times daily for one month with no refills. (*Id.*) On May 25,
22  2004, Dr. Stanton prescribed Naproxen 500 mg. twice daily. (*Id.*)

23       Twelve days later, on May 26, 2004, Van Dine called
24  Dr. Stanton's office complaining of increased pain, "worse than
25  before." He was taking two oxycodone three times daily (which was
26  twice the amount prescribed), so he was going to run out early, and
27  he requested a refill. (*Id.*)  Notes indicate the medication was
28  prescribed (60 more pills); however, apparently this was not

14 - FINDINGS & RECOMMENDATION

communicated to the pharmacy because on June 15, 2004, Van Dine saw
Dr. Stanton to state he had not received the medication and had
gone into withdrawal. (*Id.*; A.R. 419)  He stated he was leaving
the clinic to see a Dr. Grunwald, who, according to Van Dine, would
"be willing to give him more narcotic" than Dr. Stanton would
prescribe. (A.R. 419)  He stated he often needed four to six pills
per day, and it was financially difficult for him to have to be
seen each time he had an exacerbation and needed an increased
dosage.  Notes indicate he had been "tapered down to about two a
day initially, [but] then he . . . had exacerbations in the last
while." (*Id.*)  Dr. Stanton explained that she had been away at the
time Van Dine had requested his last refill, and she "certainly did
not wish him to go through withdrawal." (*Id.*)  She prescribed 90
tablets of oxycodone without dosage change, noting Van Dine's
records would be forwarded to Dr. Grunwald. (*Id.*)

On June 24, 2004, internist Gregory S. Grunwald, D.O. of the
La Grande Clinic saw Van Dine for a "comprehensive general multi-
system evaluation." (A.R. 330-31)  The doctor noted the following
history:

> [T]he patient states in 1998[,] he developed a
> significant disc herniation at C4-C6 with
> apparent cord impingement and a spinal cord
> anterior tear.  At that time he was having
> gait instability to the point that he required
> the use of a wheelchair.  He was having signi-
> ficant urinary incontinence.  He was seen by
> Dr. Perry Camp and underwent cervical fusion
> and decompression surgery.  Over the next 1-2
> years his overall condition slowly improved
> and he was able to walk again.  He still had
> significant residual neurologic deficits on
> the left upper and lower extremities.  He
> specifically has a significant loss of sensa-
> tion.  He continues to have urinary and fecal
> incontinence at times.  An MRI approximately
> two years ago was apparently negative[;]

15 - FINDINGS & RECOMMENDATION

however a recent repeat MRI at this time
demonstrates a new occurrence of C2-C3 disc
herniation and three new disk herniations in
the lumbar spine. The patient does state back
in 1998 he did have a large disc herniation in
his lumbar spine which was never addressed as
the cervical herniations were thought to be
more critical. At this time he states he is
having some increasing numbness in his left
upper extremity and in the fingers of his
right hand. He is having increasing lumbar
and cervical pain. **He is transferring care
from Dr. Stanton's office as they refused to
refill his Oxycodone and he underwent [a]
narcotics withdrawal event.** I spoke directly
with Dr. Camp who will not see this patient
again. I am not in receipt of his most recent
records[.] I do have some old records at this
time for review.

(A.R. 330; emphasis added) Van Dine was taking four to six

oxycodone 5 mg. per day. (*Id.*)

On examination, Dr. Grunwald noted Van Dine had cervical

flexion of 30 degrees, extension of 35 degrees, side bending of 45

degrees bilaterally, and rotation of 80 degrees bilaterally[8]; grip

strength 5/5 bilaterally; and normal range of motion and motor

strength of his shoulders. (A.R. 331)

Dr. Grunwald diagnosed Van Dine with "[a]pparent cervical disc

herniation remote with new cervical disk herniations"; "[r]emote

lumbar disc herniation"; "[l]eft upper and lower numbness along

with bowel and bladder incontinence from prior cervical injury";

"[r]ecent narcotics withdrawal"; and "chronic cervical and lumbar

pain." (*Id.*) He noted, *inter alia,* the following:

---

[8]The Oregon Department of Consumer and Business Services,
Workers' Compensation Division has adopted norms established by the
AMA Guides for cervical ranges of motion, as follows: flexion of 60
degrees, extension of 75 degrees, right and left lateral flexion of
45 degrees, and left and right rotation of 80 degrees. *See*
www.cbs.state.or.us/wcd/policy/bulletins/docconv_9557/2278.pdf,
"Spinal Range of Motion" form (as of Jan. 18, 2012).

16 - FINDINGS & RECOMMENDATION

>            I spoke with Dr. Camp who states he will not
> see the patient again.  I am not in receipt of
> the patient['s] MRI at this time.  As
> Dr. Camp[,] who was intimately involved in the
> patient['s] care previously[,] will not see
> the patient again[,] I feel that I am not
> capable of safely providing medical care to
> this patient.  I have asked that he find a new
> primary care physician and that we will cover
> his emergency medical needs and pain medica-
> tions and medicines over the next 30 days.  We
> will attempt to get the patient in to see
> another neurosurgeon in the next 30 days[;]
> however[,] I have notified the patient that it
> is also his responsibility to find a neuro-
> surgeon who will be willing to see him if we
> cannot.

(*Id.*; *see* A.R. 329)  The doctor refilled Van Dine's oxycodone prescription, two 5 mg. pills four times daily for one month, for a total of 240 pills.  He also gave Van Dine a prescription for thirty 10 mg. diazepam pills.  (A.R. 331)  A handwritten note dated June 30, 2004, indicates Dr. Grunwald "faxed chart notes and x-ray report to Dr. Bruce Anderson in Boise, [Idaho].  They will contact patient to set up appointment."  (*Id.*)

Van Dine returned to see Dr. Stanton twenty-one days (and 168 oxycodone pills) later, on July 20, 2004, reporting that he would not be seeing Dr. Grunwald, and asking to return to the clinic "to get his oxycodone."  (A.R. 419)  He was scheduled to see Dr. Anderson, a neurosurgeon in Boise, Idaho, the next day.  Van Dine stated he was "on paid leave from work because of inability to get around at work which they feel is a security risk."  (A.R. 419)  He complained about his difficulty finding a doctor.  He did not want to try Toradol for pain, and asked to have his oxycodone refilled.  The doctor advised him that his dosage was going to be tapered down and they would "try and stick with the

contract," rather than continuing oxycodone at a rate of six to eight pills per day. (*Id.*)  She diagnosed Van Dine with "[c]hronic lumbosacral pain and chronic narcotic dependence."  (*Id.*)  She prescribed oxycodone 5 mg. five times daily for eight days (40 pills), and diazepam 10 mg. per day for twenty days.  (A.R. 418) Dr. Stanton advised Van Dine to call internist Virgil H. DuVernay, M.D. to see if Dr. DuVernay would see him.  Dr. Stanton "advised [Van Dine] that we will not be continuing high doses of narcotics for him." (*Id.*)

Three days later, on July 23, 2004, Van Dine saw Dr. Stanton for followup. Notes indicate Dr. Anderson, the neurosurgeon, had ordered a myelogram to evaluate Van Dine's current disk herniation because his "titanium plate [was] causing poor imaging on the MRI." (*Id.*)  Dr. Anderson indicated he prescribed narcotics postop, but otherwise did not prescribe narcotics.  (*Id.*)  Van Dine asked to "taper down his narcotics and also take occasional Soma as he tapers down."  (*Id.*)  His current diagnoses included "chronic cervical disk herniation with left triceps atrophy and musculo-skeletal pain," and "[c]hronic narcotic dependence."  (*Id.*) His oxycodone was decreased to 5 mg. three times daily for a week, then twice daily for a week, and then once daily for two weeks.  He was using Valerian for his headaches and neck tension, as well as a TENS unit and hot compresses.  Van Dine stated he wanted to "come off the oxycodone." (*Id.*)

X-rays of Van Dine's cervical spine taken on July 28, 2004, showed a solid bone fusion at C4-C6, with cervical degenerative changes at C6-7.  (A.R. 461)

18 - FINDINGS & RECOMMENDATION

1    On August 14, 2004, Van Dine was seen in the emergency room at
2  Sheridan Memorial Hospital in Sheridan, Wyoming, with complaints of
3  headache, neck pain, and left arm pain.  He wanted a refill of his
4  oxycodone, stating he was on a trip[9] and had not taken enough pills
5  with him.  (A.R. 433)  Van Dine apparently arrived on a motorcycle.
6  He stated he did not drive the motorcycle, his wife did, and he
7  would not drive when he was under the influence of drugs.  (A.R.
8  436)  He was diagnosed with exacerbation of chronic neck pain, and
9  was discharged with ten 5 mg. oxycodone pills.  (*Id.*)

10    Van Dine saw Dr. Stanton on August 19, 2004, complaining that
11  his left arm was swelling easily, and his hands were getting numb
12  with burning all the way down his arm.   His back pain was
13  "tolerable right now," and there was no change in his neck pain.
14  He stated the cervical myelogram obtained by Dr. Anderson indicated
15  he did not need surgery at this point in time.  (A.R. 418)  In
16  contrast to what he told the ER at Sheridan Memorial Hospital,
17  Van Dine stated he had "lost his medication on a trip."  (A.R. 417)
18  He had been seen at Sheridan Memorial Hospital and received a
19  supply of ten oxycodone, which he was taking twice daily.  He was
20  not taking diazepam because he was "not anxious." (A.R. 417, 418)
21  Van Dine's left arm did not appear swollen at the time of the
22  examination.  He had "strength 4+/5 in the left arm compared to
23  right biceps, triceps in arm with slight decreased grip strength in
24  left compared to right."  (A.R. 417)  Van Dine stated he could
25  "reproduce symptoms by pressing on axillary node."  (*Id.*)
26  Dr. Stanton diagnosed "[n]europathy secondary to probable cervical

27  _____

28    [9]This appears to be a trip from eastern Oregon to South
    Dakota.

19 - FINDINGS & RECOMMENDATION

1  disk disease"; "[c]hronic narcotic dependence"; "[c]hronic cervical
2  neck pain"; and "[d]egenerative disk disease." (*Id.*)  Van Dine
3  stated he could not afford Neurontin.  The doctor prescribed
4  oxycodone twice daily, giving him 60 to last one month. (*Id.*)
5  Van Dine stated he was "trying to attain [sic] a job outside the
6  area, so not certain when the next follow-up will be." (*Id.*)

7       Van Dine saw a Nurse Practitioner in Dr. Stanton's office on
8  September 2, 2004, complaining that he was "unable to move his left
9  arm." (*Id.*)  He stated the condition had been present for almost
10 a month, beginning when Van Dine was in South Dakota.[10]  "He
11 currently admit[ted] to taking more than the prescribed two
12 oxycodone a day, up to five or six daily which he [said] 'does not
13 always touch the pain.'  He describe[d] the pain as being a
14 burning, gnawing sensation down his arm." (*Id.*)  The pain seemed
15 to originate in the left side of his neck and travel down his left
16 arm.  He stated he had been having ongoing problems with his left
17 shoulder for quite some time.  He also described intermittent
18 swelling in his left hand, and some loss of gripping ability.  On
19 examination, the nurse noted Van Dine had come in cradling his left
20 arm in his right hand.  There was no swelling in his left hand,
21 though it appeared "just slightly dusky." (*Id.*)  He exhibited
22 "limited range of motion of the left arm, able to extend it 90
23 degrees" before experiencing discomfort. (*Id.*)
24 / / /

25

26      [10]The Record is silent regarding when, how, and for what
   purpose Van Dine went to South Dakota.  This may have been the
27 motorcycle trip he was on in August, when he was seen in the ER in
   Sheridan, Wyoming.  If not, there were two trips between July 23
28 and September 2, 2004.

20 - FINDINGS & RECOMMENDATION

1    The nurse diagnosed "[c]hronic narcotic use," and "[l]eft
2  shoulder paresthesias." (*Id.*)  She had "much discussion" with
3  Van Dine about limiting his narcotic refills to a single provider.
4  She prescribed oxycodone 5 mg, #30, with a dosage of two tablets,
5  two to three times daily, for ten to fifteen days.[11]  She noted
6  Van Dine was scheduled for cervical and left shoulder MRIs on
7  September 9, 2004, and a followup with Dr. Stanton on September 7,
8  2004.  (A.R. 416, 417)

9    Van Dine saw Dr. Stanton on September 7, 2004, "requesting
10 more pain pills, stating his left shoulder is hurting a lot and
11 that he cannot make a fist with his left arm.  He says it is 10/10
12 pain."  (A.R. 416)  Dr. Stanton noted the following:

13            I held a discussion with the patient today
              regarding narcotic use and I advised the
14            patient that we are continually exceeding the
              contract.  The patient is continually saying
15            that he wants to taper down and then it does
              not happen.  He said we could go ahead and
16            sign a new contract today.  I wrote one up for
              oxycodone 5 mg [by mouth, twice daily] supply
17            of #60 for the first month then tapering down
              to once a day after the one month.  The
18            patient signed it and then got angry saying
              that that is not enough, that it is unethical
19            to not treat his pain and nobody ever explains
              why he has his pain, and that he has received
20            no diagnosis to explain his pain.  I advised
              the patient that I have offered Neurontin and
21            he has refused, as he does not have the money.
              He refused the pain clinic saying it did not
22            help his wife.  I advised the patient that at
              the present time we want to stick to a
23            contract and then taper off, as that is what
              we prefer at this clinic and that I will not
24            continue to escalate his oxycodone usage.  The
              patient got angry and stated that nobody
25            locally wants to see him or give him narcotics

26

27    [11]If Van Dine took two pills three times a day, thirty pills
   would only last him five days.  As discussed below, he returned for
28 more pills five days later.

21 - FINDINGS & RECOMMENDATION

1                and that he will go outside the area for this,
since he feels it is unethical for us not to
2          treat his pain.  I gave the patient a pre-
scription for oxycodone supply of #60 to last
3          one month and it should not be refilled before
then.  The patient left the clinic angry.

4

5 (*Id.*)

6     On September 9, 2004, Van Dine called Dr. Stanton's office to

7 advise that he was "calling Dr. Breland in Walla Walla for

8 appointment for natural pain meds." (*Id.*)  Notes indicate Van Dine

9 "knows that the contract says he cannot make appointments with

10 other physicians, but he just wanted [the doctor] to know that

11 [Dr. Breland] may be calling [the doctor] or contacting [her] for

12 a referral."  (*Id.*)   Records were forwarded to Dr. Breland on

13 September 10, 2004.[12]  (*Id.*)

14     On October 4, 2004, Van Dine saw Dr. Stanton complaining of

15 abdominal pain and nausea that started "when he was in Sacramento,

16 California, for a friend's funeral." (A.R. 415)  In addition to

17 his GI problems, he reported "using more of his diazepam due to his

18 increased anxiety and [had] just run out of his last refill." (*Id.*)

19 He was given prescriptions for Pepcid for the epigastric problems,

20 and his diazepam 10 mg. was refilled, #20, "with no additional

21 refill."  (*Id.*)

22     On October 14, 2004, Van Dine saw internist Virgil H.

23 DuVernay, M.D. to establish care as a new patient.[13]  Notes indicate

24

25     [12]The Record does not contain any records from Dr. Breland.

26

27     [13]Van Dine's mailing address throughout the documentary
evidence of record is in Elgin, Oregon.  Elgin is about 63 miles
from the Powder River Correctional Facility in Baker City, Oregon,
28                             (continued...)

22 - FINDINGS & RECOMMENDATION

1  Van Dine was a forty-eight-year-old "Certified Alcohol and Drug
2  Counselor," working for "Correctional Facility Powder River," where
3  he had worked for one year.  (A.R. 466)  Van Dine gave a history of
4  prior work "for Boise Cascade 1998 to 12/2000, [where] he developed
5  progressive job-related disability related to repititious [sic]
6  pulling of boards above his head, [with a two-year history] of
7  progressive increase in [bilateral extremity] weakness, and
8  paresthesias."  (Id.)  Van Dine reported that he was "stable at
9  this time and [without] concern."  (Id.)  He was taking Oxycodone
10 5 mg, two pills three times daily[14]; Valium 10 mg, one at bedtime;
11 and Lisinopril 40 mg. daily, and he requested refills of these
12 medications.  (Id.)  The doctor prescribed oxycodone 5 mg, #180, at
13 a dosage of two pills three times daily, no refills, for
14 pain/stiffness; Valium 10 mg, one daily as needed, #30, with three
15 refills; and Lisinopril 40 mg, 1 daily, #30, with five refills.
16 (A.R. 467)[15]

17      On November 16, 2004, Van Dine called Dr. DuVernay to request
18 an increase in his oxycodone dosage.  Van Dine stated he was
19 "working a new job now and having increased pain."  (A.R. 465)
20 The doctor stated Van Dine could increase his dosage to ten

---

22  [13](...continued)
23 where Van Dine was employed, and about 21 miles from Dr. DuVernay's
office in La Grande, Oregon.

25  [14]Note that on September 7, 2004, Dr. Stanton had prescribed
one oxycodone 5 mg. daily for September, with a plan to taper down
26 to once a day after one month.  There is no indication where
Van Dine got a prescription for six 5 mg. pills per day, if he did.

27  [15]Dr. DuVernay's notes include a reference to "neck pain,
recent MVA."  (A.R. 467)  There is nothing else in the record about
28 any recent motor vehicle accident.

23 - FINDINGS & RECOMMENDATION

1  milligrams four times daily as needed for pain and stiffness.
2  (*Id.*)

3      Van Dine saw Dr. DuVernay for followup on December 14, 2004.
4  He had changed jobs and was working in "Merchandising" with
5  "increased stress (too much lifting and bending) [with] increased
6  pain in the back and hand and 'from head to toe.'" (A.R. 462)  He
7  had visible "nodules" on his fingers. (*Id.*)  Van Dine requested
8  refills of oxycodone 5 mg, two pills every six hours; and Valium
9  10 mg. at night as needed for insomnia and muscle spasms.  He was
10 given prescriptions for amoxicillin for acute bronchitis and cough,
11 Disalcid for osteoarthritis in his hand, and Pepcid for GERD.  His
12 oxycodone was decreased to ten milligrams three times daily. (A.R.
13 463)  He was advised to return for followup in one month, or as
14 needed. (*Id.*)

15     On January 6, 2005, Van Dine saw family practitioner Joseph H.
16 Diehl, M.D. at the request of the state agency "for a comprehensive
17 orthopedic examination for disability evaluation," specifically
18 related to Van Dine's complaints of "arthritis, back, neck,
19 [degenerative disc disease], left arm." (A.R. 468)  Dr. Diehl
20 found Van Dine to be a fair historian, but noted that the medical
21 history Van Dine provided was "not entirely consistent with that
22 obtained by other doctors in the past[.]" (*Id.*)

23     Van Dine stated he had begun experiencing "frequent episodes
24 of weakness and numbness in the left arm" in August 2004. (*Id.*)
25 He stated a doctor diagnosed him with arthritis of the cervical and
26 lumbar spine, and all joints of his upper and lower extremities.
27 The doctor had recommended further testing, and had prescribed
28 medication, but Van Dine had not had the testing or filled the

24 - FINDINGS & RECOMMENDATION

prescription due to lack of funds.  (A.R. 468-69)  Regarding his

current symptoms, Van Dine stated as follows:

> The patient now complains of continuous pain
> in the cervical, thoracic and lumbar spine
> areas.  He also complains of continuous pain
> in the left arm and left leg.  He has frequent
> episodes of pain and stiffness in all joints
> of the upper and lower extremities.  He
> occasionally has some difficulty grasping and
> manipulating with both hands because of pain
> and stiffness about the joints of both hands.
> He indicates that his symptoms would be
> aggravated with standing for longer than 30 to
> 60 minutes at a time and walking more than six
> blocks.  Bending, stooping, squatting, or
> lifting and carrying more than 15 pounds all
> aggravate his neck, back and lower extremity
> symptoms.  He has aggravation of his neck and
> back pain with sitting for longer than 20 to
> 45 minutes at a time.  He is able to drive an
> automobile.  He has neck pain with repetitive
> motion at the cervical spine and with activi-
> ties such as working at eye level or above for
> prolonged periods of time.

(A.R. 469)  Van Dine stated he had last worked in December 2004,

for one month, stocking shelves in an auto parts store.  "He quit

that job because of aggravation of his neck and back symptoms.  He

did not quit on the advice of a physician.  Prior to that, he

worked as an alcohol and drug counselor in a correctional facility

for a period of one year.  Before that, he worked as a laborer in

a sawmill and as a carpenter."  (*Id.*)

On examination, Van Dine was observed to move slowly when

going from sitting to standing, sitting to reclining and back, and

getting on and off the examination table.  He had a broad-based

gait, with "a slight limp favoring the left leg."  (*Id.*)  He was

"moderately unsteady" when performing heel and toe walking, and

"the tandem gait maneuver."  (A.R. 470)  He could squat down half

way and get back up without assistance, but stated the maneuver

25 - FINDINGS & RECOMMENDATION

1  caused him low back pain.  He exhibited limited ranges of motion of

2  his cervical spine, with 20 degrees flexion and extension, 20

3  degrees right and left lateral flexion, and 30 degrees right and

4  left lateral rotation.  He had nearly full range of motion of his

5  lumbar spine, with 85 degrees forward flexion, 15 degrees right and

6  left lateral flexion with moderate tenderness, and negative

7  straight-leg-raising at 60 degrees on each side.  He had full range

8  of motion of his right shoulder, but limited range of motion of the

9  left shoulder, and "obvious discomfort at the extremes of range of

10  motion" of his left shoulder.  (*Id*.)   The doctor noted slight

11  swelling and tenderness over all of the joints of Van Dine's hands,

12  although Van Dine "was able to grasp effectively with either

13  hand[.]"  (*Id*.)  Van Dine had some slight tenderness of his left

14  knee, but full range of motion of both knees and ankles.  However,

15  notes indicate a neurologic examination of Van Dine's lower

16  extremities was "abnormal."  (A.R. 471)

17       Dr. Diehl concluded:

18            Based on my evaluation and a review of the
             medical records, I would conclude this patient
19            does suffer from degenerative joint disease
             and degenerative disc disease involving the
20            cervical, thoracic and lumbar spine areas.  In
             addition, he has evidence of degenerative
21            joint disease in the left shoulder and left
             knee.   Furthermore, he has evidence of a
22            residual radiculopathy involving the left
             lower extremity.
23
              I would conclude this patient probably will
24            have difficulty with vigorous and active types
             of work activity.  I think he will have diffi-
25            culty with work activities that require
             standing and walking for more than a half hour
26            at a time and for more than three to four
             hours out of an eight hour day.  He will
27            likely have difficulty with work activities
             that require walking on uneven ground or
28            climbing ladders and stairs, even on an

26 - FINDINGS & RECOMMENDATION

infrequent basis. He will likely have diffi-
culty with work activities that require
bending, stooping, squatting or lifting and
carrying more than 10 to 15 pounds on a fre-
quent basis. He will likely have difficulty
with work activities that require sitting for
prolonged periods of time unless he is allowed
to get up and move about his workplace every
hour or so. These limitations are based on
his subjective complaints of neck, back, upper
extremity and lower extremity pain with all
such activities. They are based on the
objective findings of disturbance of gait
. . ., difficulty with the squatting maneuver,
decreased range of motion at the cervical
spine area, tenderness about the left shoul-
der, decreased range of motion at the left
shoulder, tenderness about all the joints of
the hands, tenderness about the left knee,
crepitus about the left knee and imaging
abnormalities as noted previously in the
medical records.

(A.R. 472)

Dr. Diehl expressed some doubt as to the permanent nature of

Van Dine's "disability," noting that if he were able to afford the

medications prescribed by his physicians, some of his symptoms

might improve. In any event, he noted no examination findings that

would preclude Van Dine from working as a drug and alcohol

counselor. (*Id.*)

On January 7, 2005, Van Dine saw psychologist Stephen R.

Condon, Ph.D. for a psychodiagnostic evaluation at the request of

the state agency. The "evaluation included a clinical interview,

mental status examination and review of records." (A.R. 474)

Van Dine stated he had been depressed but was feeling better. He

described symptoms of anxiety and panic attacks, including

"symptoms of hyperventilating to the point of just about passing

out." (A.R. 475) He indicated his symptoms started at the time of

his neck injury, although he stated he "has 'always been anxious

27 - FINDINGS & RECOMMENDATION

throughout his life.'" (*Id.*)  However, Van Dine further stated he
had not had an anxiety attack recently, "and his experience of
anxiety ha[d] not been 'serious.'"  (A.R. 477)  Van Dine also
"commented that he believes he has attention-deficit disorder and
a learning disability," (A.R. 476), noting that fifteen minutes of
continuous reading was a long time for him to focus.[16]  (*Id.*)

Dr. Condon indicated Van Dine had seen a psychologist in the
past "for anger management issues." (*Id.*)  He reviewed doctor's
notes indicating Van Dine had been treated for anxiety and panic
attacks, with trials of Imipramine, Lorazepam, Wellbutrin, Valium,
Percocet, and Trazodone.  (A.R. 474)  He also noted that Van Dine's
medical records referred to "a 1981 motor vehicle accident in which
he was propelled 37 feet airborne, and rendered unconscious.  There
is discussion of an apparent disparity of reporting of that
particular event."  (A.R. 474)

Regarding his physical health, Van Dine stated he is in
constant pain.  "On a bad day it is hard to get out of bed; he is
stiff and rigid; his hands are swollen and it takes half a day to
get mobile."  (A.R. 477)  He has severe headaches and neck pain,
and needs assistance from his wife to open containers, and care for
his hair.  He sometimes has trouble turning on an electronic tooth-
brush.  On a good day, he can do some household chores "such as
laundry, dishes, and some vacuuming." (*Id.*)  He used to split wood
but now purchases pre-split wood because he is unable "to swing a
splitting mall, and that has been hard to come to grips with for

---

[16]This is the only reference in the Record to Van Dine having
ADD or a learning disability.  There are no diagnostic or treatment
notes regarding these conditions.

28 - FINDINGS & RECOMMENDATION

1  him." (*Id.*)  He can drive for about 75 minutes before having to
2  stop, get out of the car, and move around.  Prolonged sitting
3  increases his pain, and Dr. Condon noted Van Dine "did seem
4  somewhat uncomfortable during this particular meeting."  (*Id.*)
5  When asked if he could work currently, Vine Dine indicated he
6  "can't even walk in the morning [and] can't use [his] hands."
7  (A.R. 477-78)

8     Dr. Condon diagnosed Van Dine with a pain disorder associated
9  with his general medical condition; polysubstance dependence in
10 sustained full remission, per Van Dine's report; anxiety disorder
11 not otherwise specified; and "Rule Out Personality Disorder
12 or personality trait disturbance."  (A.R. 478)  He estimated
13 Van Dine's current GAF at 52.[17]  The doctor noted Van Dine's history
14 includes substance abuse in the past; a dysfunctional family
15 background; and some "criminal behavior in his youth, primarily
16 associated with substance abuse, and anger management issues."
17 (A.R. 479)  He suggested that given this history, a possible
18 "personality trait disturbance of personality disorder might be
19 considered as an alternative diagnosis."  (*Id.*)

20    In Dr. Condon's "summary and recommendation," he expressed no
21 opinion at all regarding Van Dine's ability to work.  He recited

22

23 [17]"Clinicians use a GAF to rate the psychological, social, and
   occupational functioning of a patient.  The scale does not evaluate
24 impairments caused by psychological or environmental factors."
   *Morgan v. Comm'r*, 169 F.3d 595, 598 n.1 (9th Cir. 1999).  A GAF of
25 51 to 60 "'indicates moderate symptoms (*e.g.*, flat affect and
   circumstantial speech, occasional panic attacks or moderate
26 difficulty in social, occupational, or school functioning.'"
   *Raegen ex rel. Syzonenko v. Astrue*, slip op., No. 10-CV-401-BR,
27 2011 WL 1756131 at *5 n.3 (D. Or. May 9, 2011) (quoting Am Psych.
   Ass'n, *Diagnostic and Statistical Manual of Mental Disorders IV*
28 (DSM-IV) 31-34 (4th ed. 2000)).

29 - FINDINGS & RECOMMENDATION

1  Van Dine's history, and Van Dine's claim that he is disabled due to
2  his "physical limitations and chronic pain," and he suggested that
3  additional medical, employment, substance abuse treatment, and
4  other records "would be of interest in understanding his
5  situation." (A.R. 479)  He opined Van Dine would have the ability
6  to handle any benefits he might be awarded, but otherwise, the
7  doctor provided no conclusions that would be useful in determining
8  whether or not Van Dine is disabled. (*See id.*)
9      On March 14, 2005, clinical psychologist Bill Hennings, Ph.D.
10 reviewed the record and completed a Psychiatric Review Technique
11 form regarding Van Dine. (A.R. 490-503)  He found Van Dine to have
12 non-severe impairments including an anxiety disorder, a pain
13 disorder, and a substance addiction disorder "in sustained full
14 remission." (A.R. 498)  He opined that Van Dine is mildly
15 restricted in his activities of daily living, social functioning,
16 and ability to maintain concentration, persistence, or pace. (A.R.
17 500)  Dr. Hennings noted Van Dine had left his job as a drug
18 counselor with the prison system "due to physical reasons (too much
19 walking on concrete floor and possible 'take down' situations with
20 aggressive prisoners[)]." (A.R. 502)  He noted Van Dine engaged in
21 daily activities including preparing meals, doing household chores
22 and some yard work, driving a car, going out alone, shopping, and
23 going to church and socializing "almost every day with his family
24 and friends." (*Id.*)  He also noted there were no opinions in the
25 record indicating Van Dine is disabled due to any mental impair-
26 ment.  Van Dine "gets along with people fairly well," and "handles
27 his own money." (*Id.*)  Although Van Dine alleges he has a memory
28 problem, his memory was not noted to be significantly impaired

30 - FINDINGS & RECOMMENDATION

during Dr. Condon's consultative evaluation, and his January 2005 cognitive screening by Dr. Condon was within normal limits. Overall, Dr. Hennings concluded Van Dine's "mental condition is non-severe." (*Id*.)  On June 2, 2005, Robert Henry Ph.D. reviewed the record and concurred in Dr. Hennings's opinions. (A.R. 504)

On March 14, 2005, Linda Jensen, M.D., a physical medicine and rehabilitation specialist, reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (A.R. 481-88)  She opined Van Dine would be able to lift ten pounds frequently and occasionally; stand/walk and sit for about six hours, each, in a normal workday, and push/pull without limitation.  She opined he could perform balancing activities frequently; he never should climb ladders, ropes, and scaffolds; and he could perform all other types of postural activities occasionally.  She found Van Dine to have no other work-related physical limitations. (*Id*.) In her comments, Dr. Jensen considered Dr. Diehl's opinions regarding Van Dine's functional abilities.  She noted Van Dine claims he has difficulty opening containers, but his grip strength was normal in June 2004, and Dr. Diehl indicated Van Dine can grasp effectively. Dr. Jensen concluded that Van Dine likely "has some pain and it is reasonable that he can work 2-4 hours before taking a break." (A.R. 488)  She found his medically-determinable impairment did not rise to the Listing level of severity. (*Id*.)

After no treatment records since December 14, 2004, Van Dine saw internal medicine specialist Scott W. Falley, M.D.[18] on May 9,

---

[18]The court notes Dr. Falley's office in La Grande, Oregon, was about 21 miles from Van Dine's home address in Elgin, Oregon.

31 - FINDINGS & RECOMMENDATION

1  2005, to establish care as a new patient.  The doctor recorded the

2  following history:

> [Van Dine] is 49 and has had difficulty with
> his neck since the late 1990s; he had cervical
> fusion surgery at the fourth-six levels in
> December 2000.  He enjoyed some improvement in
> his symptoms of cervical radiculopathy but
> began having more trouble last year.  Has had
> trouble holding jobs because of the neck and
> arm problems.  Lately he tried working at job
> in California which turned out to be more
> physical than he was led to believe.  He had
> increasing pain symptoms and then a crisis
> w[h]ere his left arm was [in] so much pain
> that he had trouble moving it.  He went to
> emergency room and received shot of Toradol.
> The arm isn't quite as bad as that right now
> but in general he has had . . . flareups of
> symptoms for the last couple of months.
> Before, he would get flareups which would
> respond to medical intervention.  This one is
> unusually protracted.
>
> He had [a] surgical evaluation with
> Dr. Anderson last year which include[d]
> myelogram. At that time[,] [t]here was no
> recommendation for surgical intervention.
>
> [Review of symptoms]: also recently he had an
> episode of urinary incontinence, involuntary,
> during sleep.  [H]e is applying for medical
> disability with the Social Security system.
> States that his main pain is the neck and the
> left arm and hand.  The third and fourth
> fingers of the left hand can be burning in
> nature.  It is difficult for him to say
> whether difficulty using the hand is due to
> pain or weakness [but] he thinks it may be due
> more to pain.  Also has lumbar pain making it
> difficult to sit for prolonged periods of
> time[.]

23  (A.R. 562)

24      Dr. Falley diagnosed Van Dine with "chronic cervical pain and

25  symptom complex consistent with cervical radiculopathy," with

26  current flareup/exacerbation of symptoms.  (*Id.*)  He directed

27  Van Dine to watch for evidence of worsening cervical myelopathy

28  such as difficulty using his legs, loss of bladder control, loss of

32 - FINDINGS & RECOMMENDATION

function of the arms or hands, and progression of excruciating pain
in either arm.  He prescribed oxycodone 5 mg, two to three pills
every four to six hours (eight to eighteen pills per day);
Flexeril, 10 mg. every evening; and a short course of Prednisone.
(A.R. 563)  He gave Van Dine a note indicating, "No work possible
for the next month."  (*Id.*)  He noted Van Dine's "prognosis for
working is certainly guarded, although he may be able to do low
impact work on, perhaps, part-time basis." (*Id.*)  Dr. Falley noted
further imaging studies and long-acting pain medication would be
indicated if Van Dine had insurance coverage, but these would be
deferred due to no insurance coverage. (*Id.*)

On May 23, 2005, Howard L. Johnson, M.D. reviewed the record
and concurred in Dr. Jensen's opinion regarding Van Dine's residual
functional capacity.  Dr. Johnson noted Van Dine consistently had
been "noted to have slow pace and display pain behaviors.
Currently capable of 20/10 lift and 4/8 stand or walk; likely would
improve with appropriate therapy and med[ication] management per
Dr. Diehl."  (A.R. 489)

On May 31, 2005, Van Dine called Dr. Falley's office to
request a medication refill.  Van Dine asked if he could change his
dosage to three oxycodone every six hours, rather than every four
hours due to the "danger of dependence on high dosages for too
long." (A.R. 561)  The doctor agreed that Van Dine could adjust
his dosage to three pills every six hours, for a total of twelve
pills per day.  (*Id.*)  Notes indicate Van Dine was attempting to
confirm insurance coverage so he could see Dr. Anderson again.
(*Id.*)

33 - FINDINGS & RECOMMENDATION

1    Van Dine called Dr. Falley's office on June 21, 2005,
2 requesting an adjustment to his medications.  He had been out of
3 town all weekend, and stated his back and neck "went out" and he
4 was in pain and had a headache.  He had increased his oxycodone
5 dosage back up to three pills every four hours, and his headache
6 and neck pain had improved, but he was still having low back pain.
7 He stated he did not have access to a telephone when the exacerba-
8 tion occurred, so he had been unable to call the doctor's office.
9 He had an upcoming appointment with the doctor, and wanted to know
10 if he should continue the increased oxycodone dosage.  He was
11 advised to go back to taking the medication every six hours.  (A.R.
12 558)

13    Van Dine saw Dr. Falley on June 23, 2005, complaining of a
14 flareup of back pain after sleeping on the floor when he traveled
15 to a relative's wedding.  He had been using oxycodone for the
16 breakthrough pain, increasing his dosage back up to three tablets
17 every four hours, for a total of eighteen pills per day.  However,
18 he was continuing to experience significant cervical pain and a
19 right-sided headache, radiating into his right neck.  He also
20 complained of pain from a neuroma on his right wrist, and "some
21 increasing low back pain with right sciatic radiation." (A.R. 556)
22 In addition, he was still experiencing numbness going into his
23 fingers.  (A.R. 557)  The doctor noted some difficulty in finding
24 specialists to see Van Dine[19], and indicated he would order a
25 cervical myelogram and an up-to-date lumbar MRI.  He also indicated

26

27    [19]Other notations in Dr. Falley's records indicate some doctors
28 would not see Van Dine for financial reasons.  *See, e.g.*, A.R. 559
("Dr. Anderson will not see pt - he's in collections").

34 - FINDINGS & RECOMMENDATION

1  Van Dine might be a candidate for epidural injections, although
2  there is no indication in the Record that Van Dine ever had the
3  injections. (*Id.*)

4      Dr. Falley prescribed 180 oxycodone 5 mg, to be taken at a
5  rate of two to three pills every six hours, with a goal of not more
6  than 60 mg. per day. The doctor noted, "We discussed the chronic
7  pain situation and medical management. [Van Dine] should not use
8  higher quantities of pain medications without notifying us. We did
9  not sign[] chronic pain contract today but should do so. I do not
10 want him to just start taking more medication and let me know about
11 it later. Ideally, if he has flareups of pain he should rest and
12 not increase his medications further. Eventually, he will need
13 chronic extended release pain management rather than the short-
14 acting drugs he is on now." (*Id.*) Although the doctor observed an
15 "exquisitely tender small nodule on the radial side of the wrist,"
16 he wanted to deal with Van Dine's other issues before addressing
17 the neuroma. (*Id.*)

18     On June 29, 2005, Van Dine called Dr. Falley's office
19 requesting to "be put back on Diazepa[m] 10 mg" because was "having
20 anxiety attacks." (A.R. 555) He had discontinued using diazepam a
21 couple of months earlier, and wanted to discontinue Flexeril and go
22 back to using 10 mg. of diazepam at night. The doctor suggested he
23 try Paxil, but Van Dine indicated he had tried Paxil in the past
24 and had experienced side effects, including severe acid reflux.
25 (*Id.*) Van Dine indicated if Dr. Falley did not want to prescribe
26 diazepam, he would "just go without." (*Id.*) Dr. Falley indicated
27 he would consider adding diazepam if Van Dine's pain medication
28 dosage were lowered. (*Id.*)

35 - FINDINGS & RECOMMENDATION

On July 7, 2005, Van Dine called Dr. Falley's office to request a refill of his oxycodone, but wanting to talk with someone first about lowering his oxycodone dosage and adding diazepam for anxiety. He stated he was "having anxiety attacks." (A.R. 554) Dr. Falley elected to reduce the oxycodone and prescribe a trial of clonazepam, rather than diazepam. (*Id.*)

Van Dine saw Dr. Falley on July 14, 2005, regarding the neuroma in his right wrist. A neuroma had been removed from the area previously but had returned. It was "impinging on structures and causing significant pain, making it hard to use the hand." (A.R. 552) The doctor noted he had examined the wrist at Van Dine's last visit, when it was "quite tender." (*Id.*) He referred Van Dine to "Dr. Warren." (*Id.*) In addition, they discussed Van Dine's ongoing "significant chronic daily pain." (*Id.*) Van Dine was taking nine oxycodone pills per day. He stated the clonazepam had "been useful for his anxiety disorder, using one half tablet twice daily or one twice daily." (*Id.*) Van Dine asked whether he should use the clonazepam if he elected to use Flexeril in the evening, and the doctor advised him not to take both clonazepam and Flexeril at the same time. Dr. Falley planned to have a radiologist review Van Dine's "hardware and decide whether MRI scanning would be appropriate," with plans to proceed with a lumbar MRI in any event. (*Id.*) The doctor noted Van Dine would benefit from a pain clinic eventually, but he had no insurance coverage. (*Id.*) He also ordered a "[s]ystemic joint x-ray," noting Van Dine likely had osteoarthritis. (A.R. 553)

On July 18, 2005, Van Dine called Dr. Falley's office to report that he had fallen, his head hit the end of the bed, and he

36 - FINDINGS & RECOMMENDATION

was having neck and back pain.  He had been in bed since the previous day.  He stated he was unable to turn his head without pain and stiffness.  He asked if he could increase his pain medication dosage, or what he should do.  He was advised not to increase his pain medications, but to rest and use heat, and he could increase his clonazepam dosage, if desired.  (A.R. 551)

On July 21, 2005, Van Dine had x-rays taken of his thoracic spine, cervical spine, shoulders, knees, hands, and left foot. (A.R. 573-75)  Findings were as follows: Cervical spine study showed degenerative disk at C6-7; thoracic spine study showed fairly well preserved disk spaces "and only minimal hypertrophic changes," with no significant degenerative changes or other abnormalities; x-rays of shoulders, hands, and knees were unremarkable; and left foot study showed "calcaneal spurring at the Achilles tendon attachment at plantar fascial insertion," and a small, cuboid erosion "of unknown significance." (*Id.*)

Van Dine called Dr. Falley's office on July 21, 2005, to report that he had gone for x-rays that day, and he was "still in a lot of pain." (A.R. 549)  He requested an appointment to see the doctor to talk about medication.  An appointment was scheduled for July 27, 2005. (*Id.*)

Van Dine called Dr. Falley's office on July 25, 2005, complaining that he was lying in bed and his pain medication was not working.  He had filled his prescription on July 7, 2005, and was supposed to take nine pills per day, but he had been taking eight to fifteen pills per day, and would run out of pain pills that day.  He requested a long-acting pill rather than the oxycodone he had been taking, stating the oxycodone did not work

37 - FINDINGS & RECOMMENDATION

1  anymore.  The doctor prescribed morphine 30 mg. twice daily.  (A.R.
2  548)

3      On July 27, 2005, Van Dine saw Dr. Falley to discuss "pain
4  management and other issues."  (A.R. 546)  Van Dine complained of
5  ongoing pain in his neck area, as well as "a lot of lumbar area
6  pain that will radiate into either leg, more so on the left, and
7  also somewhat into the lower thoracic region."  (*Id.*)  He had some
8  numbness in his left leg, and "numbness that [would] go into either
9  arm."  (*Id.*)  He was taking morphine 30 mg. twice daily for pain,
10 and on some days, he spent most of the day resting due to pain.  He
11 was avoiding the use of oxycodone or short-acting agents, which he
12 noted had become less effective.  He complained of aching in both
13 shoulders upon raising his arms.  (*Id.*)  Regarding his anxiety dis-
14 order, Van Dine reported doing better on clonazepam, which he was
15 taking twice daily rather than three times daily.  Dr. Falley noted
16 the causes of Van Dine's chronic pain "include his cervical spondy-
17 losis, his lumbar disc disease, rule out peripheral neuropathy
18 possible myofascial pain syndrome.  Possible contributing factor of
19 anxiety but not at all the primary explanation."  (*Id.*)  The doctor
20 prescribed continued morphine without any dosage change, and
21 continued use of clonazepam for the anxiety, noting they would
22 "stay away from breakthrough medicine, short-acting things, etc."
23 (*Id.*)  He referred Van Dine to "Dr. Isaacs" for "nerve conduction
24 studies to rule out peripheral neuropathy as constant pain[,]" and
25 he ordered cervical and lumbar MRIs.  (A.R. 547)

26     A phone message form in Dr. Falley's records dated August 8,
27 2005, states: "Caller: Edie - Dr. Issac [sic]," "Call Re: Pt will
28 not be seen by them.  They appreciate the referral but no."  (A.R.

38 - FINDINGS & RECOMMENDATION

545)  There is no further explanation in the record regarding this phone message.

Van Dine had MRI studies of his cervical and lumbar spine on August 9, 2005, which were compared to his September 9, 2004, cervical spine MRI, and to x-rays taken on July 21, 2005.  The new MRIs showed mild central canal stenosis at C4 through C6, the area of Van Dine's previous fusion; "mild to moderate central canal stenosis at the C6-7 level due to left posterior osteophyte and disk bulge"; and "myelomalacia of the cervical cord at the C6 level," which also was seen in the previous study.  (A.R. 570) There was no significant interval change since the prior studies. (*Id.*)

Van Dine also had x-rays of his lumbar spine on August 9, 2005, that showed "a very small central posterior disk protrusion at the L5-S1 level with an associated very small annular tear[,] [but] no resultant significant stenosis or impingement[.]"  (A.R. 571)

Van Dine saw Dr. Falley on August 17, 2005, for followup and for review of MRI studies of Van Dine's cervical and lumbar spine. Dr. Falley noted: "The cervical films show more or less stable fusion along with some evidence of the past cord trauma (myelo-malacia) and some degenerative change with no recent nerve root compression; there is some central canal stenosis.  The lumbar MRI does show disc protrusion with associated annular tear; no nerve root impingement[s] are seen.  Therefore, his picture should not require surgical referral.  He still does get radicular [t]ype pain down the left arm."  (A.R. 544)  Morphine was controlling Van Dine's pain symptoms, and he was "proceeding without

39 - FINDINGS & RECOMMENDATION

breakthrough oxycodone." (*Id.*)  Dr. Falley opined that Van Dine's left arm pain "probably represents intermittent shifting of the spinal elements to cause foraminal pressure." (*Id.*)  He noted the annular tear of Van Dine's lumbar disc probably contributed to his lumbar pain.  He prescribed continued morphine 30 mg. twice daily. In addition, he noted Van Dine "continues to be incapacitated of any activity involving recurrent walking, bending, lifting, prolonged sitting, [or] prolonged standing." (*Id.*)  The doctor also prescribed nicotine gum to assist in smoking cessation.

Dr. Falley noted Van Dine had seen "Dr. Warren" about a neuroma of his right wrist.  He indicated "that situation [was] being analyzed carefully because of the difficulty in working in that area with potential trauma to the nerve." (*Id.*)  Van Dine's wrist in the area of the neuroma was tender, especially if he happened to bump it. (*Id.*)

Van Dine called Dr. Falley's office on August 18, 2005, to request a referral to a neurologist or neurosurgeon.  Dr. Falley noted, "I don't believe this would be fruitful.  [Van Dine] and I touched on this [at] his recent visit." (A.R. 543)

On August 24, 2005, Van Dine again called Dr. Falley's office to discuss seeing a neurologist.  Van Dine was concerned that his spinal cord was "getting softer." (A.R. 542)  He wanted to know why, and what he could expect in the future.  Dr. Falley doubted a neurologist could tell Van Dine anything significant, and he doubted insurance would pay for that type of "informational" consultation. (*Id.*)  Dr. Falley spoke with Dr. Breland who stated he could not see Van Dine because the problem was outside his expertise, but he opined the softness was scarring from Van Dine's

1  earlier injury or surgery, and it would not "get worse or better."
2  (A.R. 541)   Dr. Falley concurred, and stated a referral was not
3  required for the scar, although he would not stand in Van Dine's
4  way if he wanted to see another doctor on his own.  (*Id.*)

5      Van Dine called Dr. Falley's office on September 14, 2005,
6  with complaints of diarrhea, bloating, and stomach pain.  He had
7  started a liquid diet about three days earlier, but it was not
8  helping to relieve his symptoms.  Medications were prescribed.
9  (A.R. 543)

10      Van Dine saw Dr. Falley on September 20, 2005, for followup of
11  his anxiety.  Van Dine stated his "stress levels [had] been quite
12  high because of financial difficulties, medical disability, [and]
13  wife['s] recent breast biopsy with results still pending."  (A.R.
14  539)  He reported diarrhea for about ten days.  He was directed to
15  continue taking clonazepam at the current dosage for anxiety,
16  "unless he clearly feels over sedated."  (*Id.*)  Van Dine reported
17  that morphine was working to relieve his pain symptoms at the
18  current dosage, but it was making him constipated (before his
19  recent diarrhea episode).  They decided to try a lower dosage of
20  morphine; i.e., 20 mg. at night and 30 mg. in the morning.  (*Id.*)

21      On October 3, 2005, Van Dine called Dr. Falley's office to
22  request an increase of his morphine back to the previous level of
23  30 mg. twice daily.  He had decreased the dosage as directed by the
24  doctor on September 20th, but he was waking up in pain.  His dosage
25  was increased back to the prior level of 30 mg. twice daily.  (A.R.
26  537)

27      Van Dine saw Dr. Falley on October 31, 2005, for followup of
28  a bronchial infection.  He had reduced his smoking "to about three

41 - FINDINGS & RECOMMENDATION

1  cigarettes per day." (A.R. 534)  He also was having more problems
2  with anxiety.  Clonazepam was helpful initially, but he seemed to
3  be "breaking through that." (*Id.*)  Notes indicate he had had
4  problems with antidepressants in the past.  In addition, he was
5  having pain in his left arm from an attempt to split wood, and he
6  reported "trouble with his low back going into spasms when he tried
7  to work on his roof." (*Id.*)  He had lost about twenty pounds due
8  to anxiety and loss of appetite, and he had worsening reflux
9  symptoms.  The doctor prescribed over-the-counter Prilosec for the
10 reflux, continued clonazepam for the anxiety, and continued
11 morphine 30 mg. twice daily for pain.  (A.R. 535)  In addition, the
12 doctor gave Van Dine a note stating, "Unable to work due to medical
13 reason." (A.R. 536)

14     On November 29, 2005, Van Dine called Dr. Falley's office to
15 request breakthrough pain medication.  He was taking morphine for
16 pain, but his left shoulder pain was worsening.  The doctor
17 prescribed Vicodin in addition to the morphine.  (A.R. 533)

18     Van Dine saw Dr. Falley on December 2, 2005, for, *inter alia*,
19 complaints of pain flareups involving his left arm.  Notes indicate
20 this was a "repetitive cycle for him," which tended to "last
21 several weeks and then cool off." (A.R. 531)  The doctor pre-
22 scribed Vicodin twice daily for breakthrough pain in addition to
23 his ongoing morphine therapy, noting that if Van Dine continued to
24 have breakthrough pain, the doctor would favor adjusting the
25 morphine dosage rather than increasing the Vicodin dosage. (*Id.*)

26     On December 21, 2009, Van Dine called Dr. Falley's office to
27 report that his left shoulder was still flaring up badly.  He
28 requested Vicodin for the breakthrough pain as they had done

42 - FINDINGS & RECOMMENDATION

1  before.  He was prescribed a refill of Vicodin, with a note that if
2  the shoulder continued to hurt, they would increase Van Dine's
3  morphine dosage instead of prescribing additional Vicodin.  (A.R.
4  530)

5      On December 29, 2005, Van Dine called Dr. Falley's office to
6  report that he had taken a couple of extra morphine tablets due to
7  shoulder pain.  The doctor refilled Van Dine's prescription a few
8  days early to make up for the extra pills he had taken, and
9  discontinued the Vicodin.  (A.R. 529)

10      Van Dine saw Dr. Falley on January 9, 2006, for followup of
11  his left shoulder pain.  He reported that his shoulder was
12  beginning to improve, but he had "difficulty raising the arm or
13  moving [it] around in certain directions."  (A.R. 528)  He was
14  taking morphine for pain and stated it was making him drowsy and
15  reducing his appetite.  He asked if he could try increased Flexeril
16  rather than increased morphine.  The doctor prescribed a trial of
17  Flexeril during the day, but noted it also could make him drowsy.
18  He noted, "Another option would be to switch to oxycontin[,] as
19  oxycodone when used in past did not affect his appetite.  Finally,
20  if we must, we could allow a couple of short-acting tablets per
21  day."  (*Id.*)

22      Dr. Falley also noted Van Dine had "reductions of range of
23  motion" of his shoulder, and "we should rule out primary shoulder
24  joint pathology."  (*Id.*)  He ordered an MRI to rule out a rotator
25  cuff tear.  (*Id.*)  Van Dine had the MRI of his left shoulder on
26  January 12, 2006.  The MRI showed "nonspecific increased signal in
27  the AC joint region and adjacent acromion and clavicle."  (A.R.
28  567)  The radiologist noted this was of uncertain etiology, and

43 - FINDINGS & RECOMMENDATION

1  questioned whether Van Dine had experienced trauma to the region.
2  There was a small amount of fluid surrounding the bicipital tendon
3  which could indicate bicipital tendonitis.   There were no obvious
4  labral tears.  (*Id.*)

5      Van Dine saw Dr. Falley on January 25, 2006, with a complaint
6  of "occasional episodes of fecal incontinence," and "some troubles
7  with urinary dribbling, after he has completed voiding."   (A.R.
8  527)  He was taking morphine for pain, and reporting that it made
9  him somewhat sleepy.  Dr. Falley noted the incontinence was, at
10 this point, "concerning but still minor."  (*Id.*)  Van Dine was to
11 report back if the condition worsened.  The doctor directed him to
12 continue taking the morphine, noting the medication would "take
13 some appetite away."  (*Id.*)

14     On March 20, 2006, Van Dine saw Dr. Falley with ongoing
15 complaints "about bothersome side effects from the [morphine]."
16 (A.R. 526)  He reported unwanted weight loss, loss of appetite, and
17 some grogginess.   He also complained of a recent vertigo flareup
18 with nausea, exacerbated by leaning forward.   The doctor switched
19 Van Dine to OxyContin 20 mg. twice daily, "written as the 10 mg.
20 size to allow flexibility; this would be roughly equivalent to the
21 Morphine, 30 mg. twice daily that he was taking."  (*Id.*)  Van Dine
22 was directed to bring in the remaining morphine from his current
23 prescription, which had been refilled recently.  Notes indicate the
24 OxyContin might be increased by one tablet a day, if necessary, for
25 future flareups. (*Id.*)

26     On April 6, 2006, Van Dine called Dr. Falley's office to
27 request the increase of one oxycodone pill per day, as needed,
28 which they had discussed at his March 20, 2006, visit.  Instead,

44 - FINDINGS & RECOMMENDATION

his clonazepam was increased, with notes indicating the doctor would prescribe lorazepam "to tide him over" once the clonazepam ran out.  (A.R. 525)

On April 24, 2006, Van Dine called Dr. Falley's office with a complaint of vertigo, worsening over the past three days, with dizziness to the point that he almost was vomiting.  He noted his wife was having surgery that day, and he was at the hospital with her.  The doctor prescribed meclizine.  (A.R. 524)

On April 25, 2006, Van Dine called Dr. Falley's office to state he was "ready" to switch from clonazepam to lorazepam. Nursing notes indicate, "Clonazepam out early - so we were going to [switch] to lorazepam until we can fill clonazepam again - needs 7-8 days of lorazepam to fill in the rest of the month - what dose - how many?"  (A.R. 523)  The doctor prescribed lorazepam .5 mg. three times daily, #25.  (*Id.*)

An April 27, 2006, Van Dine saw Dr. Falley with a complaint of a vertigo flareup for about the previous two months.  Van Dine stated he became dizzy from rolling over in bed or getting up from bed.  Van Dine stated he was "intensifying his counseling because of the anxiety and frustration over not being able to work."[20] (A.R. 522)  He was referred to Joseph L. Petrusek, M.D., an otolaryngologist, for the vertigo.  Clonazepam, and short-term lorazepam, were prescribed for the panic attacks and possible PTSD.[21]  (*Id.*)

---

[20]The Record does not contain progress notes from any counseling services provided to Van Dine.

[21]There are no treatment note in the Record regarding PTSD.

45 - FINDINGS & RECOMMENDATION

On May 11, 2006, Van Dine called Dr. Falley's office to request a one-pill-per-day increase in his oxycodone due to an increase in shoulder pain.  The medication was prescribed, with notes indicating this would result in #130 per month.  (A.R. 520)

On May 22, 2006, Van Dine called Dr. Falley's office to report that he had stopped taking clonazepam, and he was going to counseling to try to discontinue the drug.  He also stated his claustrophobia had prevented him from having an MRI.[22]  Dr. Falley prescribed 10 mg. of diazepam to be taken 45 minutes prior to the MRI.  (A.R. 519)

On June 1, 2006, Van Dine called Dr. Falley's office to report that he had been off clonazepam for four weeks.  He had stopped taking the drug after four "real bad anxiety attacks."  (A.R. 518) He asked for a prescription for twenty clonazepam a month, to be taken as-needed on "bad days," instead of every day.  (*Id.*)  The doctor agreed, and prescribed the drug.  (*Id.*)

Van Dine had a brain MRI on June 2, 2006, in connection with his complaints of vertigo and nausea.  The MRI was unremarkable. (A.R. 566)

On June 5, 2006, Van Dine saw Joseph L. Petrusek, M.D. complaining of vertigo.  Notes indicate Van Dine first saw Dr. Petrusek for a vertigo episode in 1991, when he was "treated with some sort of exercise," the condition had improved, and he had not had symptoms since that time.  The current episode reportedly began about four months before this visit, when Van Dine

---

[22]It appears this refers to a brain MRI ordered by Joseph L. Petrusek, M.D. in connection with Van Dine's complaints of vertigo and nausea.  (*See* A.R. 73; 566)

46 - FINDINGS & RECOMMENDATION

experienced a sudden onset of vertigo involving light-headedness, tendency to lose his balance and fall, "objects spinning and turning around him and a sensation that he is turning and he has had some nausea with this.  Virtually any head motion will set him off."  (A.R. 70)  The doctor indicated Van Dine had "a history of cervical spondylosis with a history of fusion surgery, lumbar disc disease, and chronic anxiety with a stated history of anxiety attacks and possibly PTSD and a history of depression and hypertension."  (*Id.*)  Van Dine was taking Oxycodone 20 mg. twice daily for chronic pain, and stated he was "disabled because of this."  (*Id.*)  He also was taking lisinopril, a blood pressure medication; Flexeril, a muscle relaxant; and meclizine for the vertigo.  (*Id.*)

In the "past health history" section of the doctor's intake notes, he noted Van Dine had a history of "Mumps, measles, headache due to spinal flattening, hearing loss, vertigo, chronic sinusitis, deviated septum, chronic tonsillitis, high blood pressure, mitral valve prolapse, [and] fusion C4-5-6" following an "Industrial accident."  (*Id.*)  Upon examination, Van Dine was noted to exhibit "borderline hearing loss in the low and mid frequencies and a moderate hearing loss in the high frequencies [with] [e]xcellent discrimination score bilaterally."  (A.R. 73)

Dr. Petrusek diagnosed Van Dine with benign positional vertigo ("BPPV"), and treated him with "a canalith repositioning exercise." (*Id.*)  He directed Van Dine to "sleep in a recliner for the next two days and take it from there."  (*Id.*)  He also instructed Van Dine in additional exercise because due to neck stiffness, Van Dine could not achieve "the appropriate classical position" for the

47 - FINDINGS & RECOMMENDATION

1  repositioning exercise, although significant response was elicited.
2  (*Id.*)

3      On June 20, 2006, Van Dine saw Dr. Falley for followup of his
4  anxiety and panic attacks, vertigo, and insomnia. Van Dine was
5  seeing Dr. Petrusek for his "unusually persistent vertigo . . . of
6  the benign positional type," and had a followup scheduled with him.
7  He was having some insomnia, but a reduced dosage of clonazepam was
8  helping his panic attacks. Dr. Falley noted Van Dine needed "main-
9  tenance therapy to prevent breakthrough panic attacks." (A.R. 516)
10 Instead of having Van Dine take clonazepam as needed, the doctor
11 prescribed a regular dosage of 0.5 mg. twice daily. In addition,
12 Van Dine had started some counseling that was proving helpful, and
13 Dr. Falley recommended he continue with that.[23]  (A.R. 517)

14     Van Dine returned to see Dr. Petrusek for followup on June 26,
15 2006. He reported that when he had arrived home after his previous
16 visit, he had promptly forgotten the exercises he was shown during
17 the exam.    Exam results indicate Van Dine "became acutely
18 vertiginous with his head to the right and had no vertigo at all
19 when he went back to the left." (*Id.*)  He was re-instructed in
20 appropriate exercise, and was instructed to do the exercise daily
21 after resting for two to three days. Van Dine stated his symptoms
22 had "waxed and waned on their own" over the previous four months,
23 so he was doubtful the exercises were beneficial. (*Id.*)

24     Van Dine returned to see Dr. Petrusek on July 24, 2006, and
25 reported that the exercises had relieved his vertigo, although he
26 had developed "some increased mucus in his nose and back of his

27 ─────────────
28     [23]As noted previously, the Record does not contain progress
   notes from any counseling. *But see* the summary of 08-29-06, *infra*.
   48 - FINDINGS & RECOMMENDATION

1  throat and his head felt plugged." (A.R. 75)   He was advised to
2  try the exercise again if the vertigo returned. (*Id.*)

3      On August 29, 2006, a "Jeff Kallison" called Dr. Falley's
4  office to report that Van Dine wanted to change his medication.[24]
5  The caller stated Van Dine had "been taking [increased] clonazepam
6  – abusing it," but the caller thought Van Dine was "doing ok."
7  (A.R. 515)   However, Van Dine was doing well on the OxyContin,
8  which he had cut down to one pill three times a day.   Van Dine
9  wanted a prescription for #9 OxyContin pills.   The medication was
10 approved. (*Id.*)

11     On September 13, 2006, Van Dine saw Dr. Falley "with several
12 issues that have contributed to tendency to have difficulty with
13 his prescription medication, namely the controlled substances."
14 (A.R. 514)   Van Dine stated he had experienced an escalation of
15 anxiety on clonazepam that led him to lose control with his family,
16 and resulted in his spending a night in jail.   He decided to
17 discontinue using clonazepam, and had been off the drug for about
18 two weeks.   Van Dine expressed concern about his continued use of
19 OxyContin, given his past addiction problems, although the medica-
20 tion was effective for pain control.   He was checking into "a pain
21 clinic in central Oregon that uses nonprocedural methods of
22 adapting to chronic pain," but required patients to be off all pain
23 medications. (*Id.*)   Dr. Falley wanted to wait until Van Dine had
24 confirmed that the pain clinic had a "proper funding source . . .

25

26
       [24]"Jeff Kallison" likely refers to Jeffery Callison, a Licensed
27 Professional Counselor in La Grande, Oregon, specializing in
   substance abuse and addiction.   This telephone message states "Jeff
28 sees Mart [Van Dine] (CHO)." (A.R. 515)

49 - FINDINGS & RECOMMENDATION

insurance or otherwise," before slowly tapering Van Dine off his pain medications.    He refilled Van Dine's prescription for OxyContin 10 mg, two in the morning and one in the evening, #90. Notes indicate Van Dine had "his long awaited evaluation for disability coming out." (*Id.*)

On October 9, 2006, Van Dine called Dr. Falley's office and stated he "went out and had to cut firewood - cannot receive assistance for this anymore.  After the 2nd day - felt like [he] had a knot [in the] side of [his] neck but then went out for more firewood." (A.R. 513)  He complained of neck pain and asked to increase his OxyContin to 20 mg. twice daily for one month, and then reduce it again.  Van Dine had an appointment scheduled to see Dr. Falley on October 19, 2006.    The doctor prescribed the increased medication for fourteen days. (*Id.*)

On October 19, 2006, Van Dine saw Dr. Falley "for his ongoing difficulties with cervical radiculopathy, history of cervical fusion, lumbar disc disease, [and] anxiety." (A.R. 512)  The State of Oregon had contacted the doctor and asked him to generate a residual functional capacity report.[25]  He noted Van Dine had suffered "a flareup of his cervical pain, with stiffness in the right posterior neck" about a week earlier, "when he was trying to load some firewood." (*Id.*)  Since the increase in his OxyContin dosage, Van Dine's neck pain had improved somewhat, although he still had a tender point that was bothersome.  His range of motion had recovered somewhat. (*Id.*)  Dr. Falley completed "appropriate

---

[25]The actual RFC form completed by Dr. Falley at the request of the state agency does not appear to be included in the administrative record.

50 - FINDINGS & RECOMMENDATION

areas of the form," noting, "Disability from cervical spinal injury, lumbar spondylosis, and mental health issues, particularly panic disorder/anxiety." (*Id.*)

On October 27, 2006, Van Dine called Dr. Falley's office to ask if he could "stay on 2 oxycontin - AM and PM until his neck gets better." (A.R. 511) His prescription had been for two pills morning and evening for fourteen days, and then a reduced dosage of two pills in the morning and one in the evening. The doctor approved continuation of the current dosage for fourteen more days. (A.R. 511)

On November 1, 2006, Van Dine called Dr. Falley's office requesting an early refill of his OxyContin. He had received #104 pills on October 12, 2006, and had taken two pills twice daily. He said he would be out on November 5th, which would be eight pills short. He stated he had taken an extra pill a couple of times over one weekend. He was advised to "space things out to last [until] Monday," and then his dosage would be reduced to two pills in the morning and one pill in the evening. (A.R. 510)

On November 21, 2006, Van Dine called Dr. Falley's office to request a higher OxyContin dosage at night. He stated his back and neck were still painful, and he was having trouble sleeping. He was taking two pills in the morning and one pill at night, and he wanted to return to taking two pills at night. The doctor switched the dosage to one pill in the morning and two at night. (A.R. 509)

On November 27, 2006, Van Dine called Dr. Falley's office to request an increased dosage of OxyContin. He was taking one pill in the morning and two at night, and he stated the nighttime dosage worked well, but he was rigid and stiff throughout the day. He

51 - FINDINGS & RECOMMENDATION

1  stated that on Thanksgiving day, he was sitting on the floor, and
2  when he stood up, he was numb from the waist down for awhile before
3  feeling returned.  Dr. Falley indicated Van Dine was to "continue
4  at current oxycontin dosage," but he could try adding Flexeril in
5  the morning.  (A.R. 508)

6      On December 4, 2006, Dr. Falley completed a questionnaire
7  supplied by Van Dine's attorney for purposes of Van Dine's
8  disability claim.  (A.R. 505-07)  Dr. Falley indicated he had been
9  treating Van Dine since May 9, 2005, for "cervical spinal stenosis,
10 [history of] surgery [in] 2000, cervical disc disease [and]
11 anxiety/panic."  (A.R. 505)  He indicated Van Dine experiences
12 symptoms including cervical/neck pain, lumbar pain, and "inability
13 to concentrate." (A.R. 506)  The doctor opined Van Dine could lift
14 and carry up to twenty pounds occasionally and ten pounds
15 frequently; stand and walk for a total of two hours in an eight-
16 hour workday; and must be able to alternate between sitting and
17 standing during the day to relieve pain or discomfort.  He stated
18 Van Dine would have limited ability to push and/or pull in both his
19 upper and lower extremities.  He opined Van Dine could perform
20 handling and fingering activities frequently; stooping, bending,
21 kneeling, crouching, overhead reaching, and "[f]eeling (skin
22 receptors)" activities occasionally; and never perform climbing,
23 balancing, or crawling activities. (*Id.*)  According to Dr. Falley,
24 Van Dine would miss more than two days of work a month due to
25 "[f]airly frequent flareups of neck pain; flareups of anxiety."
26 (A.R. 507)  He opined Van Dine's concentration, persistence, or
27 pace would be markedly limited due to his impairments, and his
28 medications and their side effects. (*Id.*)  He listed Van Dine's

52 - FINDINGS & RECOMMENDATION

current medications as OxyContin, Clonazepam, Flexeril, and Lisinopril. (*Id.*)

On December 14, 2006, Van Dine called Dr. Falley's office to request an increased dosage of OxyContin.  Van Dine stated he had "been in bed [for] 2 days - again - neck and back pain."  (A.R. 505)  Dr. Falley indicated Van Dine needed "to 'tough it out' and stay with the 3 oxycontin per day."  This apparently was Van Dine's last contact with Dr. Falley's office.  (*Id.*)

On March 26, 2007, Van Dine saw James Opara, M.D., a board-certified family medicine practitioner, to establish care with his clinic.[26]  Van Dine indicated he had been searching for a doctor for three months without success, and he was "very happy" when he learned this clinic could accept him as a patient.  Van Dine stated his previous doctor "left for Montana,"[27] and he had been unable to get his pain medication refilled for three months.  (A.R. 589)  He complained of "a lot of pain in the neck," rating his neck pain as an 8 to 9 on a 10-point scale, and his low back pain as a 6/10. The doctor had difficulty examining Van Dine's neck because he complained of pain with all movement.  Van Dine moved his joints well, but "complained of tenderness on flexion of the hip and the back," as well as forward and backward bending.  (A.R. 589-90)  He exhibited no loss of sensation in his upper extremities, although

---

[26]Dr. Opara's office in Walla Walla, Washington, is about 60 miles from Van Dine's home address in Elgin, Oregon.

[27]It is unclear who this statement refers to; Dr. Falley's office is still at the same address in La Grande, Oregon.  The Record does not reflect that Van Dine saw any other doctor between December 2006 and March 2007.

1  he complained of "some tingling sensation in both hands."  (A.R.
2  590)

3      Van Dine stated he had been taking OxyContin SR 10 mg, two
4  tablets twice daily, and cyclobenzaprine 10 mg. in the afternoon
5  and at bedtime.  (A.R. 589)  This is difficult to understand in the
6  context of Van Dine's statement that he had been unable to get his
7  pain medications refilled for three months, and Dr. Falley's
8  refusal to increase Van Dine's OxyContin dosage from three to four
9  pills a day on November 27 and December 14, 2006.  Per Dr. Falley's
10 prescription, Van Dine should have been taking three OxyContin
11 pills a day - one in the morning and one at night.  Dr. Opara
12 refilled the OxyContin and cyclobenzaprine at the dosage reported
13 by Van Dine (two OxyContin twice daily, and one cyclobenzaprine
14 afternoon and at bedtime), and Van Dine signed "a pain contract."
15 (A.R. 490) The doctor noted the following:

16         When I told [Van Dine] that he will get his
           medication refilled only at the Farm Workers
17         Pharmacy, he told me that it would be diffi-
           cult for him to do so because he came from
18         La Grande[28], but I told him that that is our
           new clinic policy.  After some argument and
19         the[n] spending time to explain things to him,
           he finally agreed.  I gave him a prescription
20         for OxyContin SR and the Flexeril according to
           the terms of the contract and I told him that
21         he would be getting 120 tablets of the
           Oxycontin here in the clinic once a month and
22         60 tablets of the Flexeril.  After some time,
           the pharmacist told me that it did not go
23         through and therefore, we will need to get
           prior authorization before the OxyContin can
24         go through.  When we tried to run this through
           the insurance, the insurance refused to
25         authorize that, then this triggered some kind

26

27      [28]This statement is puzzling because Van Dine's mailing address
   still was in Elgin, Oregon.  The record does not contain evidence
28 that he was living in La Grande at this time.

54 - FINDINGS & RECOMMENDATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14

of an audit and a further investigation and
also further questioning with OMAP as to the
reason why they would not authorize his
OxyContin. Finally it was discovered that the
patient had the OxyContin SR refilled in
La Grande, Oregon on the 19th of this month
and when this was brought to his notice, the
patient quickly disappeared from the clinic,
but prior to that, he was also telling the
pharmacist to ask me to give him a script so
that he can go elsewhere and fill it, but I
refused.  Given the nature of this and given
the fact that this patient came to the clinic
for the first time today and trying to be
dishonest, I, therefore, cancelled the pain
contract we already signed and I have made up
my mind that I would not refill his pain medi-
cation here anymore in the clinic and we
cannot see him here for any other pain-related
condition.  I have discussed this with our
acting clinic medical director . . . and also
our clinic administrator . . . and I will
recommend for them to divorce this patient
from our clinic since he came here for the
first visit and he tried to be dishonest,
tried to fool me to get an early refill of a
controlled substance.

15  (A.R. 590-91)

16      Dr. Opara later changed his mind about terminating Van Dine as

17  a patient, after receiving further information.  On April 23, 2007,

18  the doctor noted the following:

19
20
21
22
23
24
25
26
27
28

I have discussed this patient with our clinic
administrator . . . and according to him, he
has sent more inquiry which was made by the
pharmacist regarding [Van Dine's] use of pain
medication, and they came to the conclusion
that actually there was no evidence of him
abusing medications.  What happened the last
time was that he got the medication refilled
in La Grande to keep him going before his
appointment here and that kind of made him to
ask for early refill.  Otherwise, he has not
been shown to be misusing his pain medications
and has been getting his refill at the right
time, according to the information [the clinic
administrator] gave me as was received by the
pharmacist.  In view of this, I decided to go
ahead and have him sign a pain contract.  I
gave him 1-2 tablets of OxyContin, the 20-mg
tablets for him to take 2 times a day in

55 - FINDINGS & RECOMMENDATION

1          accordance with our previous discussions.
2     This will be refilled once a month through our
      agency pharmacy. Meanwhile, I am going to go
3     ahead and schedule him for MRI of the lumbo-
      sacral spine to see exactly what is going on
4     with his back to see whether there would be
      any need to recommend him to see a neuro-
5     surgeon, and further management plan depends
      on the findings.

6  (A.R. 598)

7      Van Dine saw Dr. Opara on April 23, 2007, for complaints of

8  "severe pain in the lumbar spine," which had worsened since his

9  last visit.   The pain was radiating into both legs, which felt

10 numb.  He had difficulty bending over, and his pain was aggravated

11 with any kind of movement.   OxyContin was effective at relieving

12 the pain.   The doctor scheduled an MRI of Van Dine's lumbosacral

13 spine for further evaluation.   (*Id.*)

14     On May 2, 2007, Van Dine had an MRI of his lumbar spine that

15 showed "mild central stenosis at L2-3 and L3-4 secondary to

16 bilateral facet hypertrophy"; and "slight broad based disc bulge

17 L5-S1 without significant compromise of canal or foramina." (A.R.

18 582)

19     Van Dine saw Dr. Opara on May 22, 2007, for followup of his

20 chronic low back pain.   Notes indicate Van Dine was "doing well."

21 (A.R. 586)   "His physical exam [was] remarkable for a moderate

22 degree of tenderness on palpation of the lumbar spine between L2

23 and L5 segments.   The MRI of the lumbosacral spine done . . . on

24 05/02/07 showed mild central stenosis at L2-3 and L3-4 secondary to

25 bilateral facet hypertrophy.   It also shows some broad-based disk

26 bulge at L4-5 without significant compromise of canal of the

27 foramen." (*Id.*)   The doctor refilled Van Dine's pain medication

28

56 - FINDINGS & RECOMMENDATION

1  and scheduled him for a physical evaluation in connection with his
2  disability application.  (*Id.*)

3      On June 13, 2007, Dr. Opara saw Van Dine to complete a
4  questionnaire supplied by Van Dine's attorney in connection with
5  Van Dine's disability application.  (A.R. 578-81; *see* A.R. 585)
6  Dr. Opara indicated he had been treating Van Dine for three months
7  for chronic low back pain and neck pain, with associated burning
8  sensation in his left upper arm.  He indicated Van Dine has a
9  reduced range of motion, abnormal gait, and tenderness as a result
10 of his back and neck pain.  (A.R. 578)  He opined Van Dine could
11 lift twenty pounds occasionally, and less than ten pounds
12 frequently; stand and/or walk for ten to fifteen minutes at one
13 time; stand for no more than one hour, total, in an eight-hour
14 workday; sit for fifteen to twenty minutes at one time, for a total
15 of one hour in an eight-hour workday; balance, crawl, reach, and
16 handle occasionally; and never climb, stoop/bend, kneel, crouch, or
17 perform fine manipulation and feeling activities on his left side.
18 Dr. Opara opined that Van Dine's concentration, persistence, or
19 pace would be affected to a moderate degree as a result of his
20 impairments, and his medications and their side effects.  (A.R.
21 579-80)  He noted Van Dine's symptoms would be "aggravated by
22 sitting, driving and stooping."  (A.R. 580)

23     According to Dr. Opara, Van Dine would miss more than two days
24 of work a month, even at a sedentary job.  In handwritten notes,
25 the doctor indicated Van Dine's "neck and low back pain and
26 drowsiness associated with his medications will make it very
27 difficult for him to be gainfully employed"; his symptoms would be
28 "aggravated with activity"; and "[h]is pain complex and medication

57 - FINDINGS & RECOMMENDATION

1 side effects will make it difficult for him to adapt to changes in
2 the work environment and work in close proximity with others."
3 (A.R. 581)

4     Van Dine saw Dr. Opara on June 20, 2007, complaining of
5 frequent, recurring episodes of weakness of his lower extremities.
6 He was concerned that his condition might be deteriorating. He
7 also requested a refill of his OxyContin for back and neck pain.
8 Notes indicate the doctor was unable to do range-of-motion testing
9 because Van Dine experienced "severe pain with any kind of
10 movement." (A.R. 583) The doctor noted Van Dine "had difficulty
11 lying down and getting out of the bed [and] he had to sit up every
12 now and then to stretch." (*Id.*) On examination, Van Dine had 1+
13 knee reflexes bilaterally, but the doctor could not elicit ankle
14 reflexes on either side. He assessed Van Dine with "[p]rogressive
15 worsening and weakness of both lower extremities. Suspect
16 compartmental syndrome most likely due to his neck or back
17 problem." (*Id.*) Dr. Opara referred Van Dine for EMG and nerve
18 conduction studies of both lower extremities, and refilled his
19 OxyContin prescription. (*Id.*)

20

21          *C.  Vocational Expert's Testimony*

22     VE Thomas Welford, "a certified rehabilitation counselor
23 working in private practice in Portland," testified at the ALJ
24 hearing. (A.R. 660) He noted Van Dine had worked for thirteen
25 years as a carpenter, categorized as a skilled, medium-level job.
26 From 1990 to 2000, he worked as a mill worker, which is categorized
27 as unskilled, heavy work. The VE stated the work Van Dine did as
28 a drug and alcohol counselor did not meet the requirements for a

58 - FINDINGS & RECOMMENDATION

substance abuse counselor under the *Dictionary of Occupational Titles* ("DOT"). Rather, Van Dine's work was more "consistent with an intake worker in that field," which is categorized as a skilled, sedentary position. (A.R. 661)

The ALJ asked the VE to assume a forty-eight-year-old individual with a GED, one year of college, and Van Dine's past work experience. The ALJ used the state agency's physical capacity determination, which would make the individual

> capable of performing a sedentary residual functional capacity, occasionally and fre-quently lifting 10 pounds, standing and walking two hours, sitting six, during an eight hour day, pushing and pulling unlimited commensurate therewith. Postural activities to include never use of a ladder, rope or scaffolding. Able to balance frequently; the rest of the postural activities at the occa-sional level. No other limitations and no mental limitations.

(A.R. 661-62) The VE stated this individual would be unable to return to Van Dine's past relevant work as a carpenter or a mill worker, "but would be able to do the . . . intake work." (A.R. 662) However, if the individual required the ability to lie down once or twice a day for at least an hour each time, he would be unable to do the intake job, and also would be unable to perform any type of work in the competitive economy. (*Id.*) Similarly, if the individual had to miss two or more days of work a month, he would be unable to work competitively. (A.R. 662-63)


### D. Van Dine's Testimony

**1. Hearing testimony**

Van Dine was born in 1955, and was 51 years old at the time of the ALJ hearing. He had some high school and obtained a G.E.D.,

59 - FINDINGS & RECOMMENDATION

1 and then attended three terms of community college consisting
2 mostly of "general, basic classes." (A.R. 623)

3    Van Dine's last job was as "an entry-level counselor in Powder
4 River Correctional facility in the . . . drug and alcohol treatment
5 unit." (*Id.*) He prepared the paperwork required to get inmates
6 into the counseling program, and facilitated group sessions
7 following a predetermined, written protocol. (A.R. 624, 626)  He
8 held the job for ten to eleven months, and then quit when his
9 problems with his neck, back, feet, and hands became bad enough
10 that he was unable to "function anymore mentally or physically."
11 (A.R. 624)  When he started the job, he was having problems with
12 his left hand, but then his right hand also worsened during the
13 time he held the job.  In addition, he had to do a lot of walking
14 on hard floors, and a lot of sitting, both of which made his
15 condition worse. (*Id.*)

16    Van Dine stated he could not return to that same type of work
17 now for several reasons.  He stated his hands have reached a point
18 where it takes anywhere from several hours to all day before his
19 hands will function properly and he can hold onto things.  He also
20 has problems with concentration and focus due to his medications.
21 He indicated his medications have "at least doubled" since he last
22 worked.  He has weakness in his legs and can only walk about a
23 block on sidewalk before he loses his coordination and begins
24 tripping over his own feet. (A.R. 625)

25    Van Dine stated he was working in a sawmill in 1997 or 1998,
26 when he ruptured two discs in his neck that "flatten[ed]" his
27 spinal cord "at the C4/5/6 level." (A.R. 626)  He originally was
28 "misdiagnosed by a chiropractor" (*id.*), and kept working for

60 - FINDINGS & RECOMMENDATION

another two years, which led to "further nerve damage," a tear in his spinal cord, the growth of bone spurs, and "a major nerve damage which affected [his] organs and [his] limbs." (A.R. 626-67) He had filed a worker's compensation claim the day he was injured, and when he finally was diagnosed properly, he underwent "emergency surgery to relieve the pressure off of two . . . places in [his] spinal cord and to get rid of the bone spurs[.]" (A.R. 627) His injury occurred on July 17, 1998, and his surgery was December 20, 2000. (A.R. 628) According to Van Dine, he has "a titanium plate on the front, two bone graphs [sic] and six screws. Two going into each vertebrae, 4, 5 and 6." (*Id.*)

Van Dine stated his symptoms "seemed to lighten up . . . a little bit" after his surgery, but they never went away, and then they got worse. He thinks it was just "in [his] head" that his symptoms were getting better, when they actually never did. (A.R. 629) He did not return to work at the sawmill, instead taking some classes to get certified as a drug intake counselor, and then beginning work in that capacity in August 2003. (*Id.*) He worked with Vocational Rehabilitation to get into the counseling position. (A.R. 631)

According to Van Dine, his condition has "[d]efinitely gotten worse" since his surgery. The progression has been slow and subtle, rather than related to any particular incident. (A.R. 629) He estimated he can stand for ten to fifteen minutes before his legs start to get weak and his back begins to hurt. The actual length of time he can stand varies from day to day, depending on his symptoms that day. After standing for ten to fifteen minutes, and taking a break and sitting for five to ten minutes, then he is

61 - FINDINGS & RECOMMENDATION

1  able to stand for another ten to fifteen minutes.  (A.R. 630)
2  As far as how long he could stand, total, in a typical eight-hour
3  workday, Van Dine suggested "a good way to measure it" is to look
4  at his counseling job.  He had a one-hour-long group he facilitated
5  in the morning, and a half-hour group in the afternoon.  He was
6  unable to stand all the way through either of those.  He estimated
7  he would not be able to stand more than one hour, total, during a
8  workday, and up to an hour-and-a-half alternating sitting and
9  standing.  (A.R. 631, 632)

10      Van Dine also has problems with sitting, which he stated "is
11  one of the worst positions for [him]."  (A.R. 632)  Pain begins
12  almost immediately when he sits, and he can only tolerate the pain
13  for twenty to thirty minutes at a time.  (A.R. 632-33)  He stated,
14  "[T]he problem is the longer I sit[,] the harder it is to get up."
15  (A.R. 633)  With breaks every twenty to thirty minutes, he
16  estimated he could sit for a total of about two hours in an eight-
17  hour workday.  (*Id.*)

18      Van Dine gets up in the morning around 9:30 or 10:00.  He
19  sleeps late because of his medications.  (A.R. 633, 634)  He and
20  his wife do a fifteen to twenty minute Bible reading together, and
21  then he tries to "get moving around."  (A.R. 633)  By 1:00 p.m., he
22  is back lying down for about an hour.  (A.R. 634)  He spends a lot
23  of time reading in his Bible, and he also reads magazines and other
24  things.  (A.R. 650-52)  He has problems with his memory, noting he
25  has to review things "over and over again to get it into my head
26  and to get it to stick, if it will."  (A.R. 652)  He attributes his
27  memory problems to his medications.  His wife takes care of
28  remembering appointment times, dates, and the like.  (A.R. 653)

62 - FINDINGS & RECOMMENDATION

His wife also usually pays the bills.  Van Dine noted their life
savings and 401k monies were gone, all except a small retirement
pension. (A.R. 653-54)  Van Dine's ten-year-old daughter gets home
from school around 3:00 p.m., and he helps her with her homework,
talks with her about her day, and they read and talk together.  At
the time of the hearing, the Van Dines did not own a television, so
they enjoyed reading to each other.[29]  (A.R. 650-52)

Van Dine used to enjoy hunting and fishing, but he has not
been able to engage in those activities since he was injured.
After his injury, he sold all of his guns and other equipment.
(A.R. 651-52)  He does not play games with his children because
games require too much sitting.  If he sits too long, then his legs
begin to go numb and his back hurts.  (He asked the ALJ for
permission to stand up, part-way through the hearing.)  (A.R. 652)

Van Dine's son does all of the yard work, and his wife and
daughter set the table and perform other tasks that would require
getting into a cabinet.  (A.R. 643, 648)  Van Dine used to enjoy
rose gardening in the 1990s, but "had to give it up" due to his
injury.  (A.R. 643)  His wife does all of the grocery shopping,
cooking, and cleaning.  Van Dine used to be able to vacuum for a
few minutes occasionally because his vacuum cleaner is turned off
and on with a foot pedal, and the machine is self-driven, so he
only had to guide it with the handle.  (A.R. 646)  However, in the
six months prior to the ALJ hearing, he had not done any vacuuming

---

[29]This testimony in October 2007, contrasts with the function
reports completed by Van Dine and his wife in December 2004, when
they indicated Van Dine enjoyed "watching Christian TV" (A.R. 188),
and watched television with his family (A.R. 214).

63 - FINDINGS & RECOMMENDATION

1 due to problems using his hands. (A.R. 647)  Van Dine does his own
2 laundry because it is light-weight and he can toss it into the
3 washer.  He does his laundry often so he has small loads.  If he
4 has a large load or heavy items, then he has his wife or son take
5 care of it.  (A.R. 647-68)

6      As far as his self care, Van Dine can shower, shave, brush his
7 teeth, and brush his hair.  He has a "fat" toothbrush that he is
8 able to hold onto.  In the shower, he has a pump dispenser for his
9 shampoo and he is able to wash his hair with one hand.  He stated
10 he does not "do a very good job of washing [his] body," but he
11 tries to do as much as he can without assistance.  (A.R. 654)  He
12 can fasten the large buttons on his pants, but his wife has to
13 fasten smaller buttons for him.  He can put on a pullover shirt
14 without help.  Someone else has to tie his shoes.  (A.R. 655)

15      Van Dine goes to church three times a week, and services are
16 two hours each.  (A.R. 648)  He does not have to pick up a hymnal
17 or other book because everything is projected on a screen.
18 However, he is able to pick up a book with his right hand.  He can
19 cradle the book in his left arm, resting it against his arm and
20 chest, and then turn pages with his right thumb.  He cannot hold a
21 book in his left hand because his fingers will not close.  (A.R.
22 648-49)  Van Dine and his wife host a Bible study in their home one
23 night a week.  They provide the meeting space and refreshments,
24 which his wife prepares, but the meeting is facilitated by someone
25 else from the church.  (A.R. 650)

26      Van Dine stated he lifted a thirty-pound bag of cat litter out
27 of his trunk and onto the ground on one occasion, but then he had
28 his son bring the bag indoors.  (A.R. 635)  He can lift a gallon of

64 - FINDINGS & RECOMMENDATION

milk with his right hand, but he could not do that repetitively.
He does no pushing or pulling with his arms at all, stating "it's
very uncomfortable and it just, I don't have the capability to do
that." (A.R. 637)  If he has to push a door open, he usually uses
the side of his hip or his shoulder.  (A.R. 638)  He also is unable
to do pushing or pulling with his legs, stating his "legs are so
weak now that [he] can't drive any distance because holding the gas
pedal steady . . . just starts hurting really bad." (*Id.*)  He can
only drive any distance if the car has cruise control.  (*Id.*)

Van Dine has problems going up or down stairs, with going down
being the worst.  (*Id.*)  He has a two-story house, but his son
occupies the upstairs while Van Dine and his wife occupy the first
floor of the home.  (A.R. 639)  There are two small steps going
into the house, and Van Dine usually has no difficulty with those.
(A.R. 640)

Van Dine also has a ruptured disc in his lower back that has
not been surgically repaired, so he is unable to bend at the waist
to pick up objects off the floor or from a low shelf.  (*Id.*)  He
does not squat because his "legs cannot hold [him] in a bent knee
position." (A.R. 641)  Reaching overhead is difficult for him
because he has "vertigo really bad," and his arm weakness prevents
him from holding his arms up for any amount of time. (A.R. 642)  He
stated he would not attempt to change an overhead light bulb.
(A.R. 643)  He has less trouble reaching out in front of him, but
he has trouble grasping smaller objects.  His wife puts his
medications into his mouth because he lacks feeling in his fingers
and he drops small objects.  (A.R. 644)  He can carry keys to the
car and put them in the ignition using his right hand, but he drops

65 - FINDINGS & RECOMMENDATION

keys frequently. He can pick up his eyeglasses if he positions
them properly. (A.R. 645) He is unable to write for long, noting
it took him forty minutes to complete "a page or two" of the
disability application before he had to stop due to pain in his
hand. (*Id.*)

The ALJ observed that he had not noticed Van Dine having any
difficulty walking when he entered the hearing room, commenting,
"If your legs are that weak you must have some problem with
walking." (A.R. 641) Van Dine responded, "I don't know what you
saw, but yeah I had trouble walking here. I have trouble walking
everywhere. So, I don't . . . know what you were looking at, maybe
it's because I was going sideways trying to get [to] these chairs,
but everywhere I walk I have trouble all the time. There's not a
. . . day that goes by that I don't have trouble walking." (*Id.*)
Van Dine has experienced atrophy in the muscles of his arms and
legs. According to him, a doctor recommended he use a cane, but
Van Dine does not want to do that until he absolutely has to. (A.R.
641-42)

Van Dine has lost weight since his injury. He weighed about
217 pounds before his injury. At the time he first applied for
benefits, he weighed 210 pounds, but by the ALJ hearing, he only
weighed about 196 pounds. (A.R. 641-42) He also has problems with
his hearing, but does not yet need a hearing aide. (A.R. 659)

Van Dine described his panic attacks, stating first his mouth
suddenly gets dry, then his heart rate and respirations increase.
He sometimes gets "tingly," and he loses focus on whatever he is
doing at the time. The panic attacks come "with no warning at
all," and he has to sit down or lie down and wait for the attack to

66 - FINDINGS & RECOMMENDATION

pass, which usually takes about fifteen minutes.  He has about one
anxiety attack a week, but seems to be over the severe panic
attacks he used to have.  (A.R. 657)

## 2.    *Written testimony*

On December 1, 2004, Van Dine completed a Function Report-
Adult in connection with his application for benefits.  (A.R. 184-
91)  He listed his daily activities as caring for his personal
hygiene; watching his children, monitoring their chores, helping
with homework, and reading; and sometimes cooking meals, doing
laundry, and "etc."  (A.R. 184-85)  He indicated he used to be able
to perform strenuous physical activities, sleep well, walk well,
ride in a car for long periods, stoop, crouch, turn his head, and
use his arms, legs, and hands well, but he is no longer able to do
these activities.  Pain keeps him awake at night.  He has trouble
with buttons, and difficulty opening containers and using the
toilet.  He requires reminders to take his medications on time.
(A.R. 185-86)  He can prepare a sandwich, fruit, and cereal, as
long as his hands are not too swollen or his "nerve damage" is not
"acting up."  (A.R. 186)  He does his own laundry once a week, but
no other housework, which causes him too much pain.  (A.R. 186-87)
He enjoys reading his Bible and "watching Christian TV."  (A.R.
188)  He attends church on "most Sundays," and school functions
with his children every month or two.  (*Id.*)  He can attend these
events alone, but he does need reminders of appointments and the
like.  (*Id.*)

Van Dine stated he is unable to "travel long distances without
severe pain," and sitting for long periods and walking are "very

67 - FINDINGS & RECOMMENDATION

1  painful." (A.R. 189) He can lift no more than fifteen pounds at
2  a time; squatting, bending, and standing are difficult for him; and
3  his ability to walk, sit, kneel, and climb stairs is "limited
4  depending on conditions." (*Id.*) He estimated he can walk 300 to
5  500 feet before he has to stop and rest for one-half hour to one
6  hour. He has problems with concentration and attention, noting he
7  has to read written instructions more than once, and he does not
8  follow spoken instructions well. (*Id.*) He indicated he gets along
9  "very well" with authority figures, and he handles stress and
10 changes in routine without problems. (A.R. 190)

11      Van Dine also completed a Claimant Pain Questionnaire on
12 December 1, 2004. (A.R. 207-09) He stated he has pain from his
13 neck down, "all the time," lasting 24 hours a day, every day. He
14 described the pain as "stiffness, neck pain, headaches, joint pain,
15 most is aching or burning. Pins and needle type pain. Numbness."
16 (A.R. 207) The pain is not brought on by any type of activity or
17 circumstances; rather, it is present all the time. "Sitting,
18 walking, lifting, sleeping, standing, bending over, [and] use of
19 hands" make the pain worse. (*Id.*) At the time he completed the
20 questionnaire, he indicated he was taking oxycodone 5 mg, two pills
21 every four to six hours, for pain.[30] He listed side effects from
22 the medication as memory problems, drowsiness, "learning," and "a
23 state of unawareness." (A.R. 208)

---

[30]Actually, Dr. DuVernay increased the dosage on November 16, 2004, to two 5 mg. pills every six hours, rather than "10 mg. every 4-6 hrs," as stated by Van Dine. On December 14, 2004, Dr. DuVernay reduced the dosage to 10 mg. every eight hours, despite Van Dine's request for an increase to 10 mg. every four hours.

68 - FINDINGS & RECOMMENDATION

1    Van Dine indicated he can be up and active for two to four
2  hours, depending on the day, before needing to rest. He is unable
3  to perform "physical tasks" such as "lifting, walking, repetitive
4  tasks, tasks such as opening containers with hands, repetitive
5  bending, sitting, standing, walking." (*Id.*) He used to enjoy
6  water skiing, motocross, hunting, and fishing, but he can no longer
7  do any of these. He only takes walks occasionally, if he has "no
8  choice," and he can only walk 500 feet without resting. (A.R. 208-
9  09) He can groom himself and prepare his own meal, but he requires
10  assistance with household chores. (A.R. 209)

11

12                    *E.   Third-Party Testimony*

13    Van Dine's wife, Tammy, completed a questionnaire regarding
14  Van Dine's functional abilities on December 7, 2004. She stated
15  she and Van Dine spend all of their time together and do
16  "everything together." (A.R. 210) Regarding Van Dine's daily
17  activities, Tammy stated, "He is in severe pain when he first wakes
18  up and it takes him a couple hours to get motivated and give his
19  pain medication time to work. He takes care of his personal
20  hygiene, he reads, he helps cook meals, he helps with housework -
21  but sweeping, vacuuming and mopping cause a lot of pain. He
22  sometimes has to lay down to rest his back when he is in pain."
23  (*Id.*) She indicated Van Dine helps care for the couple's two
24  children, who were ages 7 and 14 at the time, including cooking
25  meals for them, and he helps care for the family cat. She stated
26  Van Dine is no longer able to do "laborious work," carry heavy
27  items, bend over, squat, or "do tedious things with his hands," all
28  of which cause him severe pain. (A.R. 211) Regarding Van Dine's

69 - FINDINGS & RECOMMENDATION

1 sleep, Tammy stated, "He is in so much pain, he tosses and turns
2 all night.    He gets up in the middle of the night or before
3 daylight in the morning because his pain won't let him sleep."
4 (*Id.*)

5      Tammy indicated Van Dine's "arthritis gives him pain in his
6 hands when buttoning his clothes."  (*Id.*)  "Bending to wash his
7 legs and feet cause[s] pain in his back."  (*Id.*)  He is unable to
8 hold his arms overhead for very long without neck pain.  When his
9 hands are swollen from his arthritis, he has problems shaving, and
10 holding onto a fork or spoon.  He has difficulty wiping himself
11 because twisting causes pain.  (*Id.*)  She sometimes has to remind
12 him to take his medications.  (A.R. 212)  Tammy stated Van Dine
13 prepares his meals daily, consisting of making a sandwich, oatmeal,
14 eggs, or cereal, but she usually prepares larger meals.  He used to
15 help her cook large meals, but rarely is able to do that now.
16 According to her, Van Dine can do all types of household and yard
17 chores; however, most involve "pain and some difficulty."  (*Id.*)
18 She noted, "If chores involve bending over, lifting or squatting[,]
19 all of which increase his pain, it takes longer[,]" and he "needs
20 help and encouragement to do these things."  (*Id.*)  Van Dine is
21 able to shop for food and his personal necessities, but he shops
22 for only half an hour or less because "standing or walking on hard
23 surfaces increase[s] his pain."  (A.R. 213)  He can go out alone
24 and drive himself around. He can pay bills, handle money, and use
25 a checkbook.  (*Id.*)

26      Tammy described Van Dine's interests as reading, "watching
27 TV," and attending church.  She stated, "He reads daily but has to
28 change positions often" to prevent increased neck pain.  He watches

70 - FINDINGS & RECOMMENDATION

1   television, but is unable to sit for extended periods without
2   increased pain, and he "can't walk right when he gets up." (A.R.
3   214)   She stated Van Dine used to enjoy "other hobbies"
4   (unspecified) that he can no longer do, which causes "depression
5   and anxiety, and has lowered his quality of life." (*Id.*)  She
6   stated the family spends time together every day, reading, watching
7   TV, and eating together, and Van Dine "talks on the phone almost
8   every day with friends and family." (*Id.*)  She indicated Van Dine
9   "goes to church almost every Sunday but doesn't stay for the whole
10  service or skips Sunday School or Bible Study because he can't sit
11  for that long."  (*Id.*)  He avoids social activities that require
12  prolonged sitting, or if he goes, he arrives late or leaves early.
13  (A.R. 215)   According to Tammy, Van Dine has problems being in
14  large groups due to his "anxiety disorder." (A.R. 214)

15      Regarding Van Dine's abilities, Tammy indicated he has
16  problems with all types of postural activities, noting, "Every
17  movement causes or increases pain. He can't lift over 15 lbs. He
18  can't walk or stand for over 30 min. He can't sit for over 30-60
19  min.  All this movement causes or increases pain - so if he is
20  focusing on pain constantly, he can't concentrate or complete
21  tasks, understand, or follow instructions properly because his pain
22  dictates his ability's [sic]." (A.R. 215)  She indicated he can
23  walk for twenty to thirty minutes before having to rest, depending
24  on the time of day.  She noted his ability to do things lessens as
25  the day goes on.  She stated Van Dine does not finish what he
26  starts, and he has difficulty with instructions, which have to be
27  repeated two or three times.  (*Id.*)  According to Tammy, Van Dine
28  does not handle stress "very well at all," and he handles changes

71 - FINDINGS & RECOMMENDATION

1  in routine "with some difficulty." (A.R. 216)  She stated, "He is

2  having a hard time accepting his disability and sometimes minimizes

3  it.   Instead of really being honest about how bad his pain is he

4  minimizes it to his doctors and others because he doesn't want to

5  accept defeat."  (*Id.*)

6      Tammy indicated Van Dine uses reading glasses for reading and

7  writing.  He cannot afford to see an eye doctor, so "he uses the

8  chart in stores to determine what Rx he needs when choosing his

9  glasses."  (*Id.*)

10

11      **III.   DISABILITY DETERMINATION AND THE BURDEN OF PROOF**

12                  **A.  Legal Standards**

13      A claimant is disabled if he or she is unable to "engage in

14  any  substantial  gainful  activity  by  reason  of  any  medically

15  determinable physical or mental impairment which . . . has lasted

16  or can be expected to last for a continuous period of not less than

17  12 months[.]"  42 U.S.C. § 423(d)(1)(A).

18      "Social Security Regulations set out a five-step sequential

19  process for determining whether an applicant is disabled within the

20  meaning of the Social Security Act."  *Keyser v. Commissioner*, 648

21  F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The

22  Keyser court described the five steps in the process as follows:

23          (1) Is the claimant presently working in a
            substantially gainful activity?  (2) Is the
24          claimant's impairment severe?  (3) Does the
            impairment meet or equal one of a list of
25          specific impairments described in the regula-
            tions?  (4) Is the claimant able to perform
26          any work that he or she has done in the past?
            and (5) Are there significant numbers of jobs
27          in the national economy that the claimant can
            perform?
28

72 - FINDINGS & RECOMMENDATION

1   *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,

2   1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d

3   949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)

4   and 416.920 (b)-(f)).  The claimant bears the burden of proof for

5   the first four steps in the process.  If the claimant fails to meet

6   the burden at any of those four steps, then the claimant is not

7   disabled.  *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*,

8   482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119

9   (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth

10  general standards for evaluating disability), 404.1566 and 416.966

11  (describing "work which exists in the national economy"), and

12  416.960(c) (discussing how a claimant's vocational background

13  figures into the disability determination).

14      The Commissioner bears the burden of proof at step five of the

15  process, where the Commissioner must show the claimant can perform

16  other work that exists in significant numbers in the national

17  economy, "taking into consideration the claimant's residual

18  functional capacity, age, education, and word experience." *Tackett*

19  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner

20  fails meet this burden, then the claimant is disabled, but if the

21  Commissioner proves the claimant is able to perform other work

22  which exists in the national economy, then the claimant is not

23  disabled.  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.

24  §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

25      The ALJ determines the credibility of the medical testimony

26  and also resolves any conflicts in the evidence.  *Batson v. Comm'r*

27  *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing

28  *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

73 - FINDINGS & RECOMMENDATION

1   Ordinarily, the ALJ must give greater weight to the opinions of
2   treating physicians, but the ALJ may disregard treating physicians'
3   opinions where they are "conclusory, brief, and unsupported by the
4   record as a whole, . . . or by objective medical findings." *Id.*
5   (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
6   (9th Cir. 2001)). If the ALJ disregards a treating physician's
7   opinions, "'the ALJ must give specific, legitimate reasons'" for
8   doing so. *Id.* (quoting *Matney*).

9       The law regarding the weight to be given to the opinions of
10  treating physicians is well established. "The opinions of treating
11  physicians are given greater weight than those of examining but
12  non-treating physicians or physicians who only review the record."
13  *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
14  2003). The *Benton* court quoted with approval from *Lester v.*
15  *Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
16  follows:

17              As a general rule, more weight should be given
                to the opinion of a treating source than to
18              the opinion of doctors who do not treat the
                claimant. At least where the treating
19              doctor's opinion is not contradicted by
                another doctor, it may be rejected only for
20              "clear and convincing" reasons. We have also
                held that "clear and convincing" reasons are
21              required to reject the treating doctor's
                ultimate conclusions. Even if the treating
22              doctor's opinion is contradicted by another
                doctor, the Commissioner may not reject this
23              opinion without providing "specific and
                legitimate reasons" supported by substantial
24              evidence in the record for so doing.

25  *Lester*, *supra*.

26      The ALJ also determines the credibility of the claimant's
27  testimony regarding his or her symptoms:

28

74 - FINDINGS & RECOMMENDATION

1          In deciding whether to admit a claimant's
2     subjective symptom testimony, the ALJ must
      engage in a two-step analysis. *Smolen v.*
3     *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
      Under the first step prescribed by *Smolen*,
4     . . . the claimant must produce objective
      medical evidence of underlying "impairment,"
      and must show that the impairment, or a combi-
5     nation of impairments, "could reasonably be
      expected to produce pain or other symptoms."
6     *Id.* at 1281-82. If this . . . test is satis-
      fied, and if the ALJ's credibility analysis of
7     the claimant's testimony shows no malingering,
      then the ALJ may reject the claimant's testi-
8     mony about severity of symptoms [only] with
      "specific findings stating clear and con-
9     vincing reasons for doing so." *Id.* at 1284.

10  *Batson*, 359 F.3d at 1196.

11

12                    **B.   The ALJ's Decision**

13       The ALJ found Van Dine has not engaged in substantial gainful

14  activity since his alleged onset date of August 18, 2004.  He made

15  the following findings regarding the severity of Van Dine's

16  impairments:

17              [Van Dine] alleges nerve damage from C5-6
            fusion with depression and anxiety.  More
18          recently in 2007, he has started to allege
            pain and weakness in his hands.  In giving the
19          claimant every benefit of doubt, I find his
            back pain condition is likely severe because,
20          since September 2001, he has clearly engaged
            in narcotic drug seeking behavior because of
21          his alleged pain complaints.  Medical signs
            and clinical findings also do not support
22          physical functional limitations beyond light.
            His alleged anxiety and depression are not
23          supported at all in the medical record . . .
            and those alleged impairments are assessed as
24          non-severe[.]

25  (A.R. 21)

26       Regarding the latter finding that Van Dine's mental impair-

27  ments are unsupported by the record, the ALJ observed none of the

28  record evidence reflects that Van Dine has ever "sought any formal

75 - FINDINGS & RECOMMENDATION

mental health counseling, treatment or psychotropic medication management." (*Id.*)    Further, ALJ found Van Dine's anxiety and panic attacks to be "highly exaggerated and atypical." (*Id.*)    The ALJ also found that although Van Dine "alleges sleep problems from pain, he failed to acknowledge that his sleep difficulties could equally be the result of prescription narcotic medication abuse." (*Id.*)  The ALJ found that although Van Dine's "combined severe and non-severe impairments may cause some limitations in work, . . . his limitations do not necessarily preclude him from all work." (A.R. 26)

The ALJ further observed that although Van Dine testified he had not abused alcohol or other drugs for ten years, "his narcotic drug seeking behavior and abuse, and lying about the validity of narcotic analgesic prescriptions, are well documented in the record[.]"  (A.R. 22)    The ALJ "completely concur[red]" with Dr. Hennings's opinions of March 2005 (*see* A.R. 490-503), with which Dr. Henry concurred in June 2005 (*see* A.R. 504), in finding Van Dine's "alleged mental health impairments of depression and anxiety are non-severe, posing no limitations upon him in his capacity to do basic work activities for any prolonged period up to 12-continuous months." (A.R. 22)

The ALJ found the medical evidence of record "paints an entirely different picture" from Van Dine's allegation that after he started working as a drug intake counselor, his condition progressively worsened, until he quit the job because "he could not perform the necessary task of being able to 'take down an inmate[.]'" (A.R. 23)  In the ALJ's view, doctors at the La Grande Clinic, where Van Dine was treated from January 29, 2001, through

1  June 24, 2004, "freely prescribed" narcotic pain medications,

2  refilling prescriptions repeatedly without supporting "objective

3  medical signs from examination and no reference to any clinical

4  findings." (*Id.*)  The ALJ noted Dr. Grunwald's June 2004 concerns

5  about Van Dine's use of narcotics in conjunction with diazepam.

6  According to the ALJ, Dr. Grunwald's "range of motion testing had

7  to be approximated because of [Van Dine's] exaggerated pain

8  behavior." (*Id.*)  The ALJ noted doctors at the La Grande Clinic

9  indicated in September 2004, that Van Dine was not complying with

10 his medication contract and was not taking his medications as

11 prescribed. (A.R. 24)

12    The ALJ set out a chronology of certain medical evidence he

13 found to be significant to his findings.  Because Van Dine argues

14 the ALJ "misconstrued" and "blatantly ignored" the medical evidence

15 for purposes of characterizing Van Dine "as a narcotic drug seeker

16 without underlying severe physical impairments," Dkt. #20, p. 4,

17 the court will set out the ALJ's findings here in some detail.

18    The ALJ noted that between late 2004 through 2007, Van Dine

19 "successfully obtained refills of Oxycodone and Diazepam, despite

20 signing narcotic and benzodiazepine contracts with all of [his

21 doctors]." (*Id.*)

22              Given the diversity of his complaints among
              the various clinical visits and phone calls
23              for early refills, a brief chronology reflects
              as follows:
24                May 4, 2004, called requesting early
              refill of Oxycodone saying he "reinjured his
25              back doing gardening[.]"
                September 9, 2004, [MRI] of the cervical
26              spine revealed well healed C4-6 fusion with
              minimal narrowing.  MRI of the left shoulder
27              at this time was also assessed as "unremark-
              able[.]"
28

May 9, 2005, claimant told Dr. Falley's office he had a new job in California (Ex. 12F/pg. [562]). He did not. On July 14, 2005, he asked Dr. Falley if he might have fibromyalgia and Dr. Falley noted he does not have muscular symptomology [sic][.] On July 27, 2005, he called Dr. Falley's office complaining of a panic attack and demanded more Clonazepam[.]

July 21, 2005, MRI of the cervical-thoracic and lumbosacral spines revealed stable fusion with slight disc bulge at L5-S1 and no impingement or nerve root compromise anywhere along the cervical-thoracic and lumbosacral spines[.]

August 17, 2005 MRI of the cervical-thoracic and lumbosacral spines revealed stable fusion with slight disc bulge at L5-S1 and no impingement or nerve root compromise anywhere along the cervical-thoracic and lumbosacral spines (Ex. 12F/pg. [544]).

October 31, 2005, he called requesting early refill of Oxycodone complaining of low back spasms "when working on his roof[.]"

January 12, 2006, MRI of the left shoulder revealed no abnormalities and he was assessed with tendonitis[.] June 1, 2006, called requesting early refill of Oxycodone, did not give a reason[.] August 29, 2006, Dr. Falley opined claimant is "abusing Clonazepam[."]

October 9, 2006, called requesting early refill of Oxycodone because his back pain flared when he was "out cutting firewood]." Ten days later, on October 19, 2006, he called requesting early refill of Oxycodone because he "suffered a flare of pain while loading firewood[.]" November 27, 2006, claimant made multiple phone calls requesting early refill of Oxycodone[.] December 14, 2006, called requesting early refill of Oxycodone, Dr. Falley told him to "tough it out," no more pills[.]

March 26, 2007, "new patient" with Dr. Opara. Reported he was only taking "2 Oxycodone twice a day." Reported a drug (marijuana) and alcohol abuse history allegedly clean "25-years." Dr. Opara noted it was difficult to examine the claimant's neck because of pain complaints. Otherwise the claimant had no gross or focal neurologic deficits. Further, Dr. Opara specifically noted no evidence of any . . . wasting or loss of sensation in the lower extremities, bilaterally. Some argument ensued when

78 - FINDINGS & RECOMMENDATION

1        Dr. Opara informed the claimant he had to get
         his Oxycodone refilled in the clinic at Walla
2        Walla, Washington, even though claimant lived
         in LaGrande, Oregon.   The claimant finally
3        agreed.      Later, the pharmacist informed
         Dr. Opara that insurance would not authorize
4        the refill of Oxycodone because "patient had
         the Oxycodone SR refilled in LaGrande on the
5        19th of this month."  When this was brought to
         claimant's attention, Dr. Opara noted patient
6        "quickly   disappeared   from   the   clinic."
         Dr. Opara also learned that claimant, just
7        prior to discovery of his dishonesty, was
         telling the pharmacist to ask Dr. Opara to
8        "give him a script so that he can go elsewhere
         and   fille  it,"  which  "Dr.  Opara noted he
9        refused.    At this time, Dr. Opara cancelled
         the signed pain contract and the clinic
10       divorced itself from claimant because "he came
         here   for   the   first   visit;   tried   to   be
11       dishonest and tried to fool me to get an early
         refill of a controlled substance[.]"
12           Despite Dr. Opara's diatribe however, he
         continued to see the claimant through the date
13       of this decision.  Of particular note, on June
         20, 2007, Dr. Opara again noted it was "not
14       possible"  to  determine  any  range  of  motion
         testing because he complains of severe pain
15       "with  any  kind  of  movement."    Dr.  Opara
         referred the claimant to Dr. Conrad for nerve
16       conduction testing and EMG, however there are
         no records as of the date of this decision
17       that the studies were done, despite leaving
         the record open for a month[.]
18           [MRI] dated May 2, 2007, unchanged from
         all prior MRI results. . . .
19

20  (A.R. 24-25; citations to exhibits omitted)

21      The ALJ found Van Dine "has the residual functional capacity

22  to perform sedentary work with a sit-stand option and some postural

23  non-exertional   limitations."     (A.R.   26)    He   found   Van   Dine

24  "absolutely has no credibility," noting Van Dine had testified at

25  the hearing that he had not done any gardening since his injury in

26  1998, but the record reflects he called doctors for early refills

27  of pain medications "multiple   times   because   his   back   started

28  hurting 'when doing gardening' and 'working on his roof' and

79 - FINDINGS & RECOMMENDATION

1 'cutting and loading firewood' as late as October 2006." (A.R. 27)

2 The ALJ found the record evidence reflects "a pattern of drug

3 seeking behavior." (*Id.*)

4     The ALJ gave no weight to the vocational assessments of

5 Drs. Falley and Opara, reflecting Van Dine likely would miss two or

6 more days of work per month, noting:

> First, given the different length of time each
> doctor saw the claimant, plus the fact that
> both doctors had repeatedly noted drug seeking
> behavior but still prescribed for him, I find
> the limitation is not consistent with or
> supported by the medical evidence of record as
> detailed above. Further, both doctors have
> given an opinion on an issue reserved to the
> commissioner. Further, based on consideration
> of all the medical evidence of record
> reflected in detail above, inclusive of
> Dr. Opara's and Dr. Falley's own treatment
> notes, I find the limitation of inability to
> work without excess absences is secondary, at
> best, to drug seeking behavior of a controlled
> substance. Lastly, both doctors concede that
> absent narcotics' "potential side-effect of
> drowsiness," the claimant is capable of
> physical exertion well beyond the limitations
> of sedentary, which is what his job as a drug
> and alcohol abuse counselor required.

18 (A.R. 28)

19     Giving Van Dine "greatly more benefit of doubt than is

20 warranted," the ALJ found Van Dine has "the residual functional

21 capacity for the full range of sedentary exertion with a sit-stand

22 option allowing him to change between positions as needed in 15-to-

23 30 minute increments." (*Id.*)  He found Van Dine can lift/carry ten

24 pounds, both occasionally and frequently; sit for a total of six

25 hours a day, "not consecutively," with normal break; stand/walk for

26 two cumulative hours a day, with normal breaks; push/pull without

27 limitation; bend, balance, stoop, kneel, crouch, and crawl

28

80 - FINDINGS & RECOMMENDATION

1 occasionally; and climb stairs and ramps occasionally.  He would be
2 precluded from climbing ropes, ladders, and scaffolds.  (*Id.*)

3      The ALJ concluded that Van Dine is capable of performing his
4 past relevant work as a drug and alcohol intake counselor, and he
5 therefore is not disabled.  (A.R. 28-29)

6

7                    *IV.  STANDARD OF REVIEW*

8      The court may set aside a denial of benefits only if the
9 Commissioner's findings are "'not supported by substantial evidence
10 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
11 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
12 *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
13 *V. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
14 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
15 mere scintilla but less than a preponderance; it is such relevant
16 evidence as a reasonable mind might accept as adequate to support
17 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
18 1039 (9th Cir. 1995)).

19      The court "cannot affirm the Commissioner's decision 'simply
20 by isolating a specific quantum of supporting evidence.'"  *Holohan*
21 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
22 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
23 must consider the entire record, weighing both the evidence that
24 supports the Commissioner's conclusions, and the evidence that
25 detracts from those conclusions.  *Id.*  However, if the evidence as
26 a whole can support more than one rational interpretation, the
27 ALJ's decision must be upheld; the court may not substitute its
28

81 - FINDINGS & RECOMMENDATION

1  judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
2  *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

3
4                          ***V.  DISCUSSION***
5                          ***A.  Introduction***

6      Van Dine asserts several objections to the ALJ's findings, as
7  discussed below.  It should be evident from the above summary of
8  the record that the court has made an exhaustive review of the
9  administrative record.  From that review, the court concludes that
10 both the Record, and the ALJ's opinion, are seriously lacking in
11 several respects, requiring the case to be remanded.  The ALJ may
12 or may not arrive at the same conclusions upon remand, but if he
13 does, his decision must be supported properly under the applicable
14 regulations and case law and be based on an accurate factual
15 analysis of the Record.

16
17                      ***B.  Step Two Analysis***

18     Van Dine argues the ALJ erred at step two of the sequential
19 analysis by misconstruing and ignoring the medical evidence, and
20 mis-characterizing Van Dine's "physical impairment as a psycho-
21 logical 'pain condition,'" thereby reject[ing] all of Mr.
22 Van Dine's physical impairments as 'non-severe.'"  Dkt. #20, p. 6
23 (citing A.R. 21-23); *see id.*, pp. 3-6.  The ALJ found Van Dine's
24 "back pain condition is likely severe because, since September
25 2001, he has clearly engaged in narcotic drug seeking behavior
26 because of his alleged pain complaints." (A.R. 21)

27     Regardless of the phraseology used by the ALJ, he did, in
28 fact, find that Van Dine's back pain is a severe impairment.  Had

82 - FINDINGS & RECOMMENDATION

1  the ALJ actually found none of Van Dine's physical or mental
2  impairments to be severe, then the ALJ's analysis would have ended
3  at step two of the sequential evaluation process.  The regulations
4  provide that if a claimant does not have an impairment, or
5  combination of impairments, which significantly limits the
6  claimant's physical or mental ability to perform basic work
7  activities, then the claimant does not have a severe impairment
8  and, therefore, is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii) &
9  (c).  Here, the ALJ continued his analysis, rather than finding Van
10 Dine not to be disabled at step two.  The ALJ went on to find, at
11 step three, that Van Dine's "medically determinable severe and non-
12 severe impairments, considered both singly and in combination, do
13 not meet or medically equal" any Listed impairment. (A.R. 26)  The
14 ALJ continued his analysis through steps four and five of the
15 sequential evaluation process.  (*See* A.R. 26-29)

16      Van Dine's argument that the ALJ erred in failing to find that
17 he has a severe impairment is, therefore, in error.  However, Van
18 Dine's arguments in this section of his brief are relevant to his
19 argument that the ALJ erred in finding him not to be credible.
20 Therefore, the court will consider Van Dine's arguments in that
21 context.

22

23              *C.  Credibility Assessment*

24      The ALJ found Van Dine "absolutely has no credibility." (A.R.
25 27)  He rejected all of Van Dine's subjective complaints of pain
26 and limitations, and cited testimony and record evidence that
27 purportedly support his decision. (A.R. 27-28)  Van Dine argues
28 the ALJ erred in numerous respects that led to an erroneous

83 - FINDINGS & RECOMMENDATION

1  credibility finding and improper rejection of Van Dine's
2  complaints.

3      Van Dine cites evidence he argues reflects that his physical
4  condition remained poor even after his spine surgery, and has
5  continued to worsen since that time, and he points to certain
6  evidence he argues the ALJ ignored. *See id.*, pp. 6-9.

7      The court has concerns about the ALJ's misstatements and
8  erroneous citations of the medical evidence of record.  It often is
9  difficult or impossible for the court to determine if the ALJ's
10 conclusions are supported by the evidence because the ALJ cited to
11 pages in the Record that do not support his conclusions, or
12 sometimes actually misquoted the Record.  Several examples are set
13 forth below.

14

15 *1.  Van Dine's problems with his hands*

16     The ALJ stated, in his findings regarding the severity of
17 Van Dine's impairments, "More recently in 2007, [Van Dine] has
18 started to allege pain and weakness in his hands."  (A.R. 21)
19 However, the Record reflects that Van Dine began complaining of
20 pain and weakness in his hands at least as early as August 19, 2004
21 (A.R. 417), and continued to complain about these symptoms from
22 that point forward.  In January 2005, Van Dine told Dr. Diehl, the
23 state-agency consulting examiner, that he was experiencing problems
24 "grasping and manipulating with both hands because of pain and
25 stiffness about the joints of both hands."  (A.R. 469)  Upon
26 examination, the doctor noted slight swelling and tenderness over
27 all of the joints of Van Dine's hands, although Van Dine "was able
28 to grasp effectively with either hand."  (A.R. 470)  When Van Dine

saw Dr. Condon in January 2005, he stated his hands were swollen
when he got up in the morning, and he was unable to use his hands
for half a day.    (A.R. 476, 478)    In March 2007, Van Dine
complained to Dr. Opara of "some tingling sensation in both hands."
(A.R. 590)    At the ALJ hearing, Van Dine testified he was already
having problems with his left hand when he began his job as a drug
intake counselor, and during the time he held that job, problems
with his right hand worsened.    (A.R. 624)    He testified that by the
time of the hearing (October 26, 2007), his hands had reached the
point that it would take anywhere from several hours to all day
before they would function properly and he could hold onto things.
(A.R. 625)

The ALJ's observation that Van Dine only started alleging pain
and weakness in his hands "recently in 2007," was erroneous.

**2.    *Mental health treatment***

The ALJ found, "[i]n specific regard to [Van Dine's] alleged
anxiety and depression impairments, the medical evidence of record
reflects he has not sought any formal mental health counseling,
treatment or psychotropic medication management."  (A.R. 21)  This
statement is in error.    Although the record does not contain
progress notes from counseling sessions, Van Dine told his doctors
that he was in counseling, and a counselor contacted Dr. Falley in
June 2006, stating he was seeing Van Dine.  (A.R. 515)  The ALJ
stated he had considered "all subsequently dated medical evidence
of record since the PRTF assessment of June 2005," yet he
erroneously indicated Van Dine had sought no formal mental health
treatment and had not been treated with psychotropic medications.

85 - FINDINGS & RECOMMENDATION

Van Dine's medical doctors referenced his anxiety on a regular basis, and treated him with antidepressants and other medications. These are referenced in the detailed summary of Van Dine's medical history, above.

"'In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Hayes v. Astrue*, 270 Fed. Appx. 502, 504 (9th Cir. 2008) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983) (per curiam)). "This duty exists even when the claimant is represented by counsel. *Id.* Fulfilling this duty may require the ALJ to consult a medical expert or to obtain a consultative examination. *Loeks v. Astrue*, slip op., 2011 WL 198146, at *5 (D. Or. Jan. 18, 2011) (Haggerty, J.) (citing 20 C.F.R. §§ 404.1519a, 416.919a). "Relatedly, an ALJ must take reasonable steps to ensure that issues and questions raised during the presentation of medical evidence are addressed so that the disability determination is fairly made on a sufficient record of information." *Id.* (citing *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); 20 C.F.R. §§ 404.1527(c)(3) and 416.927(c)(3) ("explaining how an ALJ may obtain additional evidence where medical evidence is insufficient to determine whether claimant is disabled"); 20 C.F.R. §§ 404.1512(e) and 416.912(e) ("obtaining additional information from treating doctors")). However, if the record evidence is unambiguous, and is sufficient to allow for proper evaluation, then the duty to develop the record further is not triggered. *Id.* (citing *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)); *Frampton v. Astrue*, slip op., 2010 WL 373867, at *13 (D. Or. Jan. 29, 2010) (Mosman, J.) (same).

86 - FINDINGS & RECOMMENDATION

Here, "the presentation of medical evidence" raises issues and questions regarding the nature and extent of Van Dine's allegations of disabling anxiety and depression.  These questions gave rise to a duty by the ALJ to develop the Record further on this issue.

The ALJ also found that Van Dine's "alleged symptomology of anxiety and panic attacks are highly exaggerated and atypical." (A.R. 21)  The ALJ offers no support for this conclusion, which appears to be based on his own personal views.  There is no reference to a treating doctor or any doctor's opinion to support this conclusion.

### 3. *August 17, 2005, MRI studies*

On August 17, 2005, Van Dine underwent MRI studies of his cervical and lumbar spine.  (*See* A.R. 569-72)  Regarding Van Dine's cervical spine, the radiologist found "mild central canal stenosis" at C4 through C6; "mild to moderate central canal stenosis at the C6-7 level due to left posterior osteophyte and disk bulge"; continued "myelomalacia of the cervical cord at the C6 level"; and "no significant interval change" since the prior MRI of September 9, 2004.  (A.R. 570)  Regarding Van Dine's lumbar spine, the radiologist found "a small hemangioma involving the T12 vertebrae"; "a very small annular tear and a very small posterior disk protrusion" at L5-S1, with no "nerve root impingement or significant central canal stenosis"; and no change from the prior MRI.  (A.R. 571)

The ALJ summarized these findings as revealing "stable fusion with slight disc bulge at L5-S1 and no impingement or nerve root compromise anywhere along the cervical-thoracic and lumbosacral

1  spines." (A.R. 25, citing "Ex. 12F/pg. 280" - i.e., A.R. 544)  The

2  page cited by the ALJ contains Dr. Falley's summary of the MRI

3  findings, which the doctor characterized as follows:

> The cervical films show more or less stable
> fusion along with some evidence of the past
> cord trauma (myelomalacia) and some degenera-
> tive change with no recent nerve root compres-
> sion; there is some central canal stenosis.
> The lumbar MRI does show disc protrusion with
> associated annular tear; no nerve root
> impingement [is] seen. Therefore, his picture
> should not require surgical referral.  He
> still does get radicular [t]ype pain down the
> left arm.

10  (A.R. 544)  In his Assessment and Plan from this visit, Dr. Falley

11  noted:

> Cervical and Lumbar spondylosis with chronic
> pain associated.  The radiculitis to the left
> arm probably represents intermittent shifting
> of the spinal elements to cause foraminal
> pressure.  **He does have the annular tear of
> his lumbar disc which probably contributes to
> ongoing lumbar pain there. . . . He continues
> to be incapacitated of any activity involving
> recurrent walking, bending, lifting, prolonged
> sitting, prolonged standing.**

18  (*Id.*; emphasis added)

19      The ALJ's summary of these MRI findings is incomplete,

20  pointing only to the positive finding of no nerve root compromise.

21  Although the ALJ noted a "slight disc bulge at L5-S1," he failed to

22  note the "very small annular tear" at L5-S1, or the "small

23  hemangioma" at T12.  He also failed to note the myelomalacia, or

24  softening of the spinal cord, from Van Dine's prior spinal cord

25  injury, nor did he discuss the similarity between symptoms

26  described by Van Dine and those shown to exist in persons with

27  myelomalacia (e.g., numbness, and weakening of the lower extremi-

28  ties).  *See Surratt v. Astrue*, slip op., 2009 WL 5184009, at *5

88 - FINDINGS & RECOMMENDATION

1  n.77 (N.D. Ill. Dec. 21, 2009) (citing F.W. Langdon, *Myelomalacia,*
2  *With Especial Reference To Diagnosis and Treatment*, Journal of
3  Nervous and Mental Disease, 32(5): 233 (1994)).  *See also* A.R. 563
4  (Dr. Falley advised Van Dine to watch for evidence that his
5  condition was worsening, difficulty using his legs, loss of bladder
6  control, loss of function of the arms or hands, and progression of
7  excruciating pain in either arm).

8

9  **4.   Dizziness**

10      The ALJ stated, "Contrary to claimant's testimony of having
11  'bad dizziness from progressively worsening hearing loss,'
12  Dr. Grunwald noted claimant 'denied dizziness, localized weakness,
13  parathesias and loss of sensation/function.'"  (A.R. 23)  The
14  stated "quote" from Van Dine's testimony (i.e., "bad dizziness from
15  progressively worsening hearing loss") does not appear anywhere in
16  the Record.

17      Van Dine was seen for vertigo, with associated dizziness, in
18  approximately 1990, but repeatedly denied dizziness to his doctors
19  over the next twenty-plus years.  He truthfully denied dizziness to
20  Dr. Grunwald in 2004.  He began experiencing vertigo again and was
21  seen for vertigo, with dizziness as a noted symptom, in April 2006
22  – nearly two years after Dr. Grunwald saw him.  At the ALJ hearing,
23  Van Dine stated he gets "vertigo really bad" if he tilts his head
24  way back, but he never stated anything about dizziness from
25  progressively worsening hearing loss.  Indeed, when he saw
26  Dr. Petrusek for the vertigo, he reported "a long-standing history
27  of mild to moderate hearing loss which has not changed with this."
28  (A.R. 70).

89 - FINDINGS & RECOMMENDATION

1    The ALJ's statement misrepresents the record.

2

3    *5.    Daily activities*

4        The ALJ listed Van Dine's daily activities as "cutting
5    firewood, gardening, working on his roof and driving to Sacramento,
6    California, and Walla Walla, Washington, to see Dr. Opara";
7    preparing meals daily, driving, shopping, going out alone "such as
8    to church every week"; being sociable, holding Bible study in his
9    home, doing some yard work, and handling his own money.  (A.R. 28)

10        There is a single entry in the record where Van Dine mentioned
11    hurting his back while gardening.  The entry is in May 2004, *prior*
12    *to* Van Dine's alleged onset date.  Van Dine testified at the
13    hearing that he had to stop gardening because it causes him undue
14    back pain.  Regarding the work on his roof, doctor's notes from
15    October 31, 2005, indicated Van Dine "tried to work on his roof,"
16    but it caused muscle spasms and pain.  The evidence does indicate
17    that Van Dine cut wood on occasion, although at one point he
18    indicated he "had to cut firewood - cannot receive assistance for
19    this anymore."[31]  Further, there is no indication that cutting wood,
20    gardening, or working on the roof were "daily" activities for him,
21    rather than occasional attempts.  For instance, the references to
22    cutting wood were on October 31, 2005, and October 16, 2006, to
23    Dr. Falley each time.

24        However, at least one of Van Dine's other activities is more
25    troubling.  The most troubling of Van Dine's more common, admitted

26

---

27        [31]*See* A.R. 477, where Van Dine indicated to Dr. Condon, on
     January 7, 2005, that he "used to split wood but now he gets all
28    his wood pre-split."

90 - FINDINGS & RECOMMENDATION

1  daily activities is the amount of time he was required to spend

2  either driving or riding in a car to and from his doctors' offices,

3  and trips involving long drives.  If, as the evidence suggests, he

4  was living in Elgin, Oregon, but seeing doctors in La Grande,

5  Oregon, and Walla Walla, Washington (as well as in Idaho, at one

6  point), he regularly spent an hour or more, each way, visiting his

7  doctors. This contradicts Van Dine's allegation that he is unable

8  to sit for more than 20 to 45 minutes at a time.  *See, e.g.*, A.R.

9  469.

10       In addition, the court observes that it appears Van Dine went

11  on a lengthy motorcycle trip in the summer of 2004, most likely to

12  South Dakota.  Although it is not clear whether Van Dine was the

13  driver or the passenger for the majority of the trip, the impact

14  and body movement from riding on a motorcycle would seem to be

15  inconsistent with his complaints of debilitating pain with all

16  types of activity.  He also may have driven to Sacramento at one

17  point, as noted by the ALJ.

18       His other daily activities, however, do not appear to be of

19  the type that would demonstrate an "'ability to work on a *sustained*

20  basis.'"  *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995)

21  (quoting 20 C.f.R. § 404.1512(a); emphasis by the *Lester* court).

22  "Occasional symptom-free periods - and even the sporadic ability to

23  work - are not inconsistent with disability."  *Id.*; *accord Feskens*

24  *v. Astrue*, ___ F. Supp. 2d ___, 2011 WL 1344060, at *10 (D. Or.

25  Apr. 8, 2011) (Brown, J.)

26       The purpose for which the ALJ relied on Van Dine's daily

27  activities is not clear from the ALJ's decision.  The Ninth Circuit

28  "has repeatedly asserted that the mere fact that a plaintiff has

91 - FINDINGS & RECOMMENDATION

1  carried on certain daily activities . . . does not in any way

2  detract from her credibility as to her overall disability."

3  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *accord Orn*

4  *v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (citing *Vertigan*).

5  The Ninth Circuit recognizes two grounds for using daily activities

6  to form the basis of an adverse credibility determination.  The

7  first is when a claimant's daily activities contradict the

8  claimant's other testimony.  The second is when the "'claimant is

9  able to spend a substantial part of his day engaged in pursuits

10 involving the performance of physical functions that are trans-

11 ferable to a work setting.'"  *Orn*, 495 F.3d at 639 (quoting *Fair v.*

12 *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); citing *Burch v. Barnhart*,

13 400 F.3d 676, 681 (9th Cir. 2005)).  Thus, to meet the second

14 ground, a claimant's daily activities must be "'transferable' to a

15 work setting," and the claimant must spend "a 'substantial' part of

16 his day engaged in transferable skills."  *Id.* (quoting *Fair*, 885

17 F.2d at 603).  Significantly, "[t]he ALJ must make 'specific

18 findings relating to [the daily] activities' and their trans-

19 ferability to conclude that a claimant's daily activities warrant

20 an adverse credibility determination."  *Id.* (quoting *Burch*, 400

21 F.3d at 681).  No such analysis appears in the ALJ's opinion here.

22     It would appear that the ALJ cited Van Dine's activities to

23 show their inconsistency with his other testimony.  However, as

24 noted above, this is less than clear.  Upon remand, the ALJ should

25 be directed to clarify how Van Dine's daily activities relate to

26 the ALJ's credibility finding.  Further, where some of the ALJ's

27 reasons supporting an adverse credibility finding are invalid, at

28 least insofar as the Record is developed currently, the court "must

92 - FINDINGS & RECOMMENDATION

1  determine whether the ALJ's reliance on such reasons was harmless
2  error." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162
3  (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359
4  F.3d 1190, 1195-97 (9th Cir. 2004) "(applying harmless error
5  standard where one of the ALJ's several reasons supporting an
6  adverse credibility finding was held invalid)"). The ALJ's error
7  may be harmless if it is "'inconsequential to the ultimate
8  nondisability determination.'" *Id.* (quoting *Stout v. Comm'r, Soc.*
9  *Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006)); *accord Sims v.*
10  *Astrue*, slip op., 2012 WL 364055, at *4 (D. Or. Feb. 2, 2012)
11  (Haggerty, J.) (quoting *Carmickle*).

12      In this case, the ALJ's credibility determination was pivotal,
13  permeating the ALJ's entire decision. He cited some invalid
14  reasons, as well as some valid ones, to support his adverse
15  credibility finding. Until his opinion is clarified, developed,
16  and supported properly, it will not be clear if Van Dine's
17  credibility was rejected properly or not. As such, the court finds
18  the ALJ's error in assessing Van Dine's daily activities was not
19  harmless, and the case should be remanded for further proceedings
20  relative to Van Dine's daily activities.

21

22  **6.    *ALJ's conclusions regarding drug-seeking behavior***

23      The ALJ wrote that Van Dine's "narcotic drug seeking behavior
24  and abuse, and lying about the validity of narcotic analgesic
25  prescriptions, are well documented in the record[.]" (A.R. 22) To
26  support this statement, the ALJ misstated or misinterpreted the
27  Record in numerous respects.

28

1     The ALJ stated the state-agency psychological examiner,

2 Dr. Condon, "diagnosed [Van Dine] with a pain disorder associated

3 with both psychological factors and general medical condition as

4 well as secondary to narcotic drug seeking behavior and abuse[.]"

5 (*Id.*)  Dr. Condon made <u>no</u> finding or observation that Van Dine had

6 exhibited "narcotic drug seeking behavior and abuse."  In the

7 doctor's summary of Van Dine's history, he only noted that Van Dine

8 had "a past history of substance abuse" for which he had obtained

9 successful treatment.  (A.R. 479)

10     The ALJ further stated Van Dine's "alleged depression and

11 anxiety with narcotic drug seeking behavior and abuse were noted by

12 the State Agency non-examining medical consultants as consistent

13 for listings 12.04 (Affective-Depressive Disorders); 12.06

14 (Anxiety-Related Disorders) and 12.09 (Substance Addiction

15 Disorders, not in remission)."  (A.R. 22)  This, again, misstates

16 the record.  There was no mention of any "narcotic drug seeking

17 behavior and abuse" by any of the state-agency non-examining

18 medical consultants.  *See* A.R. 498 (Dr. Hennings's opinion that

19 Van Dine has a substance addiction disorder consisting of "Poly-

20 substance dependence in sustained full remission"); 502

21 (Dr. Hennings's consulting notes, with no mention of drug-seeking

22 behavior); & 504 (Dr. Henry's consulting notes upon recon-

23 sideration).

24     The ALJ stated Dr. Grunwald's "range of motion testing had to

25 be approximated because of [Van Dine's] exaggerated pain behavior."

26 (A.R. 23)  There is nothing whatsoever in Dr. Grunwald's examina-

27 tion notes to substantiate the ALJ's statement that Van Dine

28 exhibited "exaggerated pain behavior."  (*See* A.R. 330-31)  In his

94 - FINDINGS & RECOMMENDATION

examination of Van Dine's cervical spine, Dr. Grunwald wrote, "Cervical evaluation: Range of motion in degrees cervical spine gross visual approximation," (A.R. 331), followed by range-of-motion findings as set forth in the medical summary, above. Similarly, the doctor noted, "Lumbar evaluation: . . . Range of motion in degrees lumbar spine gross visual approximation[.]" (*Id.*)   There is nothing in the doctor's notes to indicate why a "gross visual approximation" was utilized rather than some other method of measurement, nor is there anything in the doctor's notes to indicate Van Dine exhibited "exaggerated pain behavior."

The ALJ wrote that Van Dine sought early refills of pain medications "multiple times because his back started hurting 'when doing gardening' and 'working on his roof[.]'"   (A.R. 27)   The court has already discussed, above, the Record regarding Van Dine's gardening, which took place prior to his alleged onset date, and the one occasion when he worked on his roof.

In giving no weight to the opinions of Drs. Falley and Opara that Van Dine likely would have to miss two or more days of work per month due to pain and other symptoms, the ALJ noted, "First, given the different length of time each doctor saw the claimant, plus the fact that both doctors had repeatedly noted drug seeking behavior but still prescribed for him, I find the limitation is not consistent with or supported by the medical evidence of record[.]" (A.R. 28)   The court has located no comment throughout Dr. Falley's records that Van Dine was exhibiting "drug seeking behavior." Dr. Falley was actively involved in Van Dine's pain medication management, as summarized in detail above in this opinion.   The doctor expressed concern about Van Dine's long-term use of narcotic

95 - FINDINGS & RECOMMENDATION

1  pain medications, noting a longer-acting pain medication would be
2  preferable if Van Dine had insurance coverage or could afford it.
3  He continued to prescribe narcotic pain medications for Van Dine,
4  and closely monitored his use of the medications.  *See* the court's
5  summary, above.   It is not clear why this physician-patient
6  relationship ended.  The cited reason for rejecting Dr. Falley's
7  opinion is not comprehensible.   The portion that appears to be
8  understandable is not supported by the Record.

9       Regarding Dr. Opara, the ALJ mischaracterizes the record by
10 indicating Van Dine was dishonest with the doctor about obtaining
11 pain medications, yet "[d]espite Dr. Opara's diatribe . . ., he
12 continued to see [Van Dine] . . ." (A.R. 25)  The ALJ failed to
13 acknowledge that a full investigation by the pharmacist and clinic
14 director resulted in their finding that "there was no evidence of
15 [Van Dine] abusing medications," and he was refilling his pain
16 medications appropriately." (A.R. 587)  However, as noted above,
17 this was not well explained by Dr. Opara, and significant inconsis-
18 tencies remain with the recorded reports of Van Dine's statements
19 to Dr. Opara.

20      Despite the fact that the ALJ cited mistaken support for his
21 statement that Van Dine exhibited drug-seeking behavior, the Record
22 nevertheless indicates that was the case.   Van Dine repeatedly
23 increased his medication dosages to deal with pain exacerbations
24 without consulting his physicians.  More than once, he disagreed
25 with a physician and even got into arguments with his doctors
26 regarding the type and amount of pain medication he should receive.
27 The Record indicates he changed doctors and even threatened to "go
28 outside the area" to find a doctor who would prescribe narcotics

96 - FINDINGS & RECOMMENDATION

1  for him.   Virtually every doctor Van Dine has seen since his
2  initial back injury has expressed grave concern regarding Van
3  Dine's use of narcotic pain medications.   Most had him on a
4  narcotic pain medication contract.   There were questions raised by
5  some doctors or notations made about Van Dine getting medications
6  from more than one doctor at a time.   Van Dine made inaccurate
7  statements to doctors about his dosages more than once.   Neverthe-
8  less, no doctor has ever expressed any doubt as to the veracity of
9  Van Dine's pain complaints, and despite their concerns, doctors
10 have continued to prescribe high doses of pain medications for him.
11      It was error for the ALJ to discount Van Dine's subjective
12 pain complaints simply because of his dependence on narcotic pain
13 medications.   Indeed, the need for ongoing, high doses of pain
14 medication can actually support a plaintiff's credibility.   The
15 Commissioner has recognized this fact in a Social Security Ruling
16 discussing how an ALJ is to assess a claimant's credibility,
17 noting, "Persistent attempts by the individual to obtain relief of
18 pain or other symptoms, such as by increasing medications, . . .
19 may be a strong indication that the symptoms are a source of
20 distress to the individual and generally lend support to an
21 individual's allegations of intense and persistent symptoms."   SSR
22 96-7p.   *See, e.g.*, *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir.
23 1998) (consistent diagnoses of chronic pain, coupled with history
24 of treatment with narcotic pain medications, is objective evidence
25 that claimant is "experiencing great pain") (citing *Bakalarski v.*
26 *Apfel*, 131 F.3d 151 (Table), 1997 WL 748653, at *3 (10th Cir.
27 1997), in turn citing, *inter alia*, DSM-IV at 459, noting "risk of
28 opioid dependence or abuse associated with chronic pain disorder").

97 - FINDINGS & RECOMMENDATION

1  The courts have recognized that although drug-seeking behavior may
2  indicate a claimant is motivated by a desire to obtain narcotics,
3  such behavior is equally indicative of the credibility of a
4  claimant's high pain levels. *See, e.g.*, *Sevene v. Astrue*, slip
5  op., No. 2:10-cv-302, 2011 WL 4708793, at *6 (D. Vt. 2011) (citing,
6  *inter alia*, *Cox, supra*); *Cox, supra*; *Bakalarski v. Apfel*, 131 F.3d
7  151 (Table), 1997 WL 748653, at #3 (10th Cir. 1997).

8         If the ALJ is using Van Dine's dependence on narcotic pain
9  medications for the purpose of finding his complaints of disabling
10 pain not to be credible, then the ALJ must go much further in
11 supporting such a determination with appropriate evidence.  On the
12 other hand, if the ALJ believes Van Dine's narcotic dependence is,
13 itself, the cause of his disabling symptoms, then an entirely
14 different analysis is required under the regulations. *See* 20
15 C.F.R. § 404.1535 (setting forth guidelines for determining whether
16 a claimant's addiction to alcohol or other drugs is a "contributing
17 factor material to the determination of disability").  In either
18 event, remand is required for further consideration of the evidence
19 regarding Van Dine's use of narcotic pain medications, and
20 regarding the purpose for which the ALJ is using this evidence.

21

22              ***D.  Opinions of Treating Physicians***

23         Van Dine argues the ALJ improperly rejected the opinions of
24 his primary care providers, Drs. Falley and Opara, both of whom
25 opined Van Dine would have to miss more than two days of work per
26 month due to pain, and he also would have job-related physical
27 limitations that would prevent him from sustaining full-time work.
28 The Commissioner argues the ALJ properly gave no weight to these

doctors' opinions based on the evidence cited by the ALJ, and
because the doctors' opinions regarding Van Dine's disability were
"outside of their certified medical expertise," and "on issues
reserved to the Commissioner." Dkt. #21, p. 15.

The law regarding the weight to be given to the opinions of
treating physicians is well established. "The opinions of treating
physicians are given greater weight than those of examining but
non-treating physicians or physicians who only review the record."
*Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036 (9th Cir.
2003). The *Benton* court quoted with approval from *Lester v.
Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held as
follows:

> As a general rule, more weight should be given
> to the opinion of a treating source than to
> the opinion of doctors who do not treat the
> claimant. **At least where the treating
> doctor's opinion is not contradicted by
> another doctor**, it may be rejected only for
> "clear and convincing" reasons. We have also
> held that "clear and convincing" reasons are
> required to reject the treating doctor's
> ultimate conclusions. Even if the treating
> doctor's opinion is contradicted by another
> doctor, the Commissioner may not reject this
> opinion without providing "specific and
> legitimate reasons" supported by substantial
> evidence in the record for so doing.

*Lester*, *supra* (emphasis added). Dr. Falley's and Dr. Opara's
opinions are not contradicted by any other doctor; therefore, the
ALJ was required to cite "clear and convincing" reasons for
rejecting their opinions.

Here, the ALJ gave Dr. Falley's and Dr. Opara's opinions "no
weight for several reasons." (A.R. 28) The ALJ found that at the
time the opinions were given, the doctors had not treated Van Dine
for long enough to support their opinions. (*Id.*) The length of

99 - FINDINGS & RECOMMENDATION

1  treatment time is not particularly determinative.  Some conditions
2  take quite some time to evaluate and treat, while others do not.
3  The two doctors had seen Van Dine for differing periods of time.
4  The ALJ observes, correctly, that Dr. Opara had only been treating
5  Van Dine for about three months at the time he provided his opinion
6  regarding Van Dine's functional abilities.  Dr. Opara had only seen
7  Van Dine three times, and had no records from previous doctors to
8  review.  He had MRI studies, and concluded these did not support
9  any change in treatment.  Essentially, then, Dr. Opara had some
10 objective findings based on the MRI reports and his own examination
11 of Van Dine, and some subjective findings based on Van Dine's
12 complaints and history.  He initially had doubts about Van Dine's
13 honesty, but these were resolved in Van Dine's favor, though some
14 discrepancies remained.  The length of his treatment relationship
15 with Van Dine was hardly a reason for rejecting the doctor's
16 opinion about Van Dine's functional capacity.

17     Dr. Falley's treating relationship with Van Dine was
18 considerably longer.  His treatment relationship with Van Dine
19 began on May 9, 2005.  He gave his opinion that Van Dine would miss
20 more than two days of work a month on December 4, 2006, some
21 nineteen months later.  A treating physician has the "opportunity
22 to know and observe the patient as an individual," entitling his or
23 her opinion to "greater weight than the opinions of other
24 physicians." *Smolen*, 80 F.3d at 1285 (citations omitted).  A
25 nineteen-month treatment relationship is ample for the types of
26 observations that would entitle Dr. Falley's opinion to substantial
27 weight.

28

100 - FINDINGS & RECOMMENDATION

1    In sum, the ALJ's "[f]irst" justification for giving the
2  doctors' opinions no weight is difficult to understand. (*See* A.R.
3  28, "First, given the different length of time each doctor saw the
4  claimant, plus the fact that both doctors had repeatedly noted drug
5  seeking behavior but still prescribed for him, I find the
6  limitation is not consistent with or supported by the medical
7  evidence of record as detailed above.")

8    The ALJ also found "the limitation of inability to work
9  without excess absences is secondary, at best, to drug seeking
10 behavior of a controlled substance." (A.R. 28)  The court has
11 addressed this issue extensively, above.  The ALJ's frequent
12 repetition of his finding regarding Van Dine's drug-seeking
13 behavior does not lend this finding any more credence.  Moreover,
14 this portion of the ALJ's opinion simply makes no sense.  How can
15 two doctors' opinions that Van Dine has an "inability to work
16 without excess absences" be "secondary . . . to drug seeking
17 behavior," if the doctors do not express that opinion themselves?

18   The ALJ complains that both Dr. Falley and Dr. Opara
19 "repeatedly noted drug seeking behavior but still prescribed
20 [narcotics] for [Van Dine]." *Id.*  Although a true statement, as
21 discussed above, it is also true that neither doctor ever expressed
22 doubt about the veracity of Van Dine's pain complaints.  While the
23 ALJ may be of the opinion that Van Dine's potential need to be
24 absent from work more than two days a month is due more to his
25 addiction than to pain, these two doctors did not express that
26 opinion and the ALJ's conclusion must be based on evidence in the
27 Record, not his personal opinion.  This is not a valid reason for
28

1  rejecting the doctors' opinions regarding Van Dine's projected
2  absence from work twice or more per month.

3      The ALJ also notes Drs. Falley and Opara both acknowledged
4  that drowsiness is a side effect of Van Dine's medications. (A.R.
5  28) The ALJ further stated that although Van Dine "alleges sleep
6  problems from pain, he failed to acknowledge that his sleep
7  difficulties could equally be the result of prescription narcotic
8  medication abuse." (A.R. 21) Van Dine complained to his doctors
9  repeatedly of drowsiness from his medications, while acknowledging
10 that the narcotics were necessary to alleviate his pain. At the
11 ALJ hearing, he testified that he sleeps late due to his medica-
12 tions, and he attributed his memory problems to his medications.
13 (*See* A.R. 633, 634, 653) Van Dine, therefore, did "acknowledge"
14 that his medications could be contributing to his sleep diffi-
15 culties. Again, this is not a valid reason for rejecting the
16 opinions of Van Dine's treating sources.

17     The ALJ also stated these doctors "have given an opinion on an
18 issue reserved to the commissioner." (A.R. 28) A doctor's opinion
19 that a claimant is disabled is on an issue "reserved to the
20 Commissioner because [it is an] administrative finding[] that [is]
21 dispositive of a case." 20 C.F.R. § 404.1527(e)(1). However, such
22 an opinion was not offered by either doctor on the forms in
23 question. While an ALJ may reject doctors' opinions given on
24 "check-off reports that [do] not contain any explanation of the
25 bases of their conclusions," *Crane v. Shalala*, 76 F.3d 251, 253
26 (9th Cir. 1996) (citing *Murray v. Heckler*, 722 F.3d 299, 501 (9th
27 Cir. 1983)), in this case, both doctors provided handwritten
28 explanations for their conclusions. Dr. Falley stated he would

102 - FINDINGS & RECOMMENDATION

expect Van Dine to miss more than two days of work a month based on "Fairly frequent flareups of neck pain; flareups of anxiety." (A.R. 507) Dr. Opara similarly indicated Van Dine would have to miss more than two days of work a month, noting, "His neck and low back pain and drowsiness associated with his medications will make it very difficult for him to be gainfully employed." (A.R. 581) Dr. Opara also noted, "Symptoms will be aggravated with activity. . . . His pain complex and medication side effects will make it difficult for him to adapt to changes in the work environment and work in close proximity with others." (*Id.*) It was improper for the ALJ to reject these uncontradicted opinions without providing clear and convincing reasons for doing so.

Although the ALJ cited reasons for rejecting the opinions of Drs. Falley and Opara, his reasons were not clear and convincing, as required by law, *see Lester, supra*, nor was his failure to give the doctors' opinions controlling weight supported by substantial evidence. Upon remand, the ALJ should be directed give controlling weight to the opinions of Drs. Falley and Opara, or alternatively, to cite clear and convincing reasons, supported by identified evidence in the Record, for rejecting their opinions.


## VI. CONCLUSION

The ALJ erred in numerous respects in reaching his conclusion that Van Dine is not disabled. The ALJ's errors require remand for further development of the Record, and further consideration of the evidence, as discussed above in this opinion. Should the ALJ reach the same conclusion - that Van Dine is not disabled - then he should be directed to issue a new decision that properly supports

1  his conclusions with accurate citations to Record, and appropriate

2  justification under the regulations.

3

4                    ***VII.   SCHEDULING ORDER***

5       These Findings and Recommendations will be referred to a

6  district judge.  Objections, if any, are due by **March 12, 2012**.  If

7  no objections are filed, then the Findings and Recommendations will

8  go under advisement on that date.  If objections are filed, then

9  any response is due by **March 20, 2012**.  By the earlier of the

10 response due date or the date a response is filed, the Findings and

11 Recommendations will go under advisement.

12      IT IS SO ORDERED.

13                       Dated this 27th day of February, 2012.

14

15                       /s/ Dennis J. Hubel

16                       _____

17                       Dennis James Hubel
                         Unites States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

104 - FINDINGS & RECOMMENDATION